877 A.2d 1183

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
MICHAEL ARTHUR, DEFENDANT-APPELLANT.

Argued March 15, 2005—Decided July 19, 2005.

308

310 

*Roger L. Camacho,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Sara B. Liebman,* Assistant Prosecutor, argued the cause for respondent (*Theodore J. Romankow,* Union County Prosecutor, attorney; *Steven J. Kaflowitz,* Assistant Prosecutor, on the letter in lieu of brief).

Judge SKILLMAN (temporarily assigned) delivered the opinion of the Court.

This is an appeal from the denial of a petition for post-conviction relief based on the alleged ineffective assistance of trial counsel in the defense of a prosecution for a sale of drugs. Defendant's primary claim is that his counsel was ineffective in failing to call as a defense witness Robert Jackson, who initially told defense counsel that he was the one who sold the drugs but then retracted this admission when informed he could be subject to prosecution. We conclude that defense counsel's decision not to call Jackson

was a reasonable strategic decision because the buyer of the drugs, Robin Crittenden, testified that Jackson was the one who sold her the drugs and defense counsel could reasonably have believed Jackson would harm the defense case by denying Crittenden's allegation that he was the seller. We also reject defendant's arguments that trial counsel provided ineffective assistance by failing to visit the scene of the drug transaction or to interview potential defense witnesses before trial and by failing to call other witnesses who could have testified defendant did not sell drugs to Crittenden.

I

A jury found defendant guilty of distribution of cocaine, in violation of *N.J.S.A.* 2C:35–5(a)(1) and *N.J.S.A.* 2C:35–5(b)(3); distribution of cocaine within 500 feet of a public park, in violation of *N.J.S.A.* 2C:35–7.1; possession of cocaine, in violation of *N.J.S.A.* 2C:35–10(a)(1); possession of cocaine with the intent to distribute, in violation of *N.J.S.A.* 2C:35–5(a)(1) and *N.J.S.A.* 2C:35–5(b)(3); and possession of cocaine within 500 feet of a public park with the intent to distribute, in violation of *N.J.S.A.* 2C:35–7.1. The trial court granted the State's motion to sentence defendant to an extended term pursuant to *N.J.S.A.* 2C:43–6(f) and imposed concurrent fifteen-year terms of imprisonment, with five years of parole ineligibility, for distribution of cocaine within 500 feet of a public park and possession of cocaine within 500 feet of a public park with the intent to distribute. The Appellate Division affirmed defendant's conviction and sentence in an unreported opinion, *State v. Arthur*, No. A–1892–00T4 (App.Div. Apr. 23, 2002), and this Court denied his petition for certification, 174 *N.J.* 545, 810 *A.*2d 64 (2002).

Defendant filed a petition for post-conviction relief based on the alleged ineffective assistance provided by his trial counsel, which was supported by affidavits of Jackson and three other potential witnesses whom counsel did not call at defendant's trial. Judge Barisonek, who also was the trial judge, conducted a two-day

evidentiary hearing in which Jackson, defendant, defendant's brother James Arthur, defendant's fiancée Crystal Ross and defense counsel all testified. Based on the evidence presented at that hearing and the trial record, Judge Barisonek concluded that defendant had failed to prove his ineffective assistance claim and denied the petition.

The Appellate Division affirmed in an unreported opinion, which concluded that defense counsel had not provided ineffective assistance by failing to call Jackson as a defense witness and also rejected defendant's other arguments. This Court granted defendant's petition for certification limited to the issue of whether he received ineffective assistance of trial counsel. 182 *N.J.* 628, 868 *A.*2d 1031 (2005).[1]

Defendant's convictions were based primarily on the testimony of Andre Crawford, a detective in the Narcotics Bureau of the Plainfield Police Department. While Crawford was conducting an undercover narcotics surveillance from an undisclosed location in the late afternoon on June 23, 1998, he observed defendant place some items behind bushes located at 969 West 3rd Street in Plainfield. Defendant then got into a car that left the area for a brief period. When he returned, defendant went to the bushes, bent down to check the items he had placed there, and walked back to the street. Shortly thereafter, defendant was approached by a woman named Robin Crittenden. After defendant and Crittenden spoke briefly, defendant went to the bushes, retrieved an item, and walked back to Crittenden, who handed him money in exchange for the item. Crawford testified that he had an unobstructed view of the apparent drug transaction from a distance of less than thirty feet and that he knew defendant before observing him on this occasion.

---

[1] Defendant also argued in the Appellate Division that his counsel at the hearing on the petition for post-conviction relief was ineffective in failing to raise a prosecutorial misconduct issue and that Judge Barisonek improperly limited his cross-examination of trial counsel. Those arguments are not encompassed by the order granting certification.

Crawford radioed the officers in his back-up unit to come to the area. The officers arrived within a short time and immediately detained defendant and Crittenden. Because there were other people in the area, the officers brought them onto the porch of 969 West 3rd Street. Crawford confirmed by radio from his surveillance location that they were the two persons he had observed engage in an apparent drug transaction.

Crittenden said to one of the officers: "I don't have anything. What's going on here." She then dropped a vial from her hand, which was subsequently determined to contain cocaine. At this point, the officers placed defendant and Crittenden under arrest.

Crawford directed one of the officers to the bushes where he had observed defendant retrieve the item that he handed to Crittenden. The officer found a brown bag at that location, which contained a Kentucky Fried Chicken box with forty-five vials of what was subsequently determined to be cocaine. A subsequent examination of the evidence disclosed that the vial dropped by Crittenden had the same kind of white cover as forty-three of the forty-five vials found behind the bushes.

Crittenden testified on defendant's behalf that the person who sold her cocaine was not defendant but instead Robert Jackson, who resided at 969 West 3rd Street. Crittenden testified that she told Crawford and the other police officers that Jackson, not defendant, sold her the drugs but "they didn't want to hear it" and kept insisting defendant was the seller. Crittenden testified that even though she eventually named defendant as the seller when she pled guilty to charges based on her role in the transaction, she did so only because the prosecutor required her to identify defendant to get the benefit of her plea bargain.

On cross-examination, Crittenden was confronted with the parts of the plea transcript in which she identified defendant as the seller. She also acknowledged that she had three prior criminal convictions.

On redirect, defense counsel brought out that when her guilty plea was being taken, she initially identified Jackson, not defendant, as the seller. However, the judge indicated he would not accept the plea and declared a recess. According to Crittenden, she identified defendant as the seller at this point because she was scared that she would lose the benefit of her plea bargain.

After Crittenden completed her testimony, the prosecutor stated that she wanted to call Jackson as a rebuttal witness but that, after speaking with defense counsel, Jackson had "left the building" and was "nowhere to be found." The prosecutor asked the trial court to delay the trial to afford her an opportunity to locate Jackson, but the court denied the application.

At the hearing on defendant's petition for post-conviction relief, Jackson testified that defendant brought him to the courthouse on the first day of the trial and that he told defendant's trial counsel that he, not defendant, was the one who sold drugs to Crittenden. Jackson was then interviewed by an investigator from the prosecutor's office. According to Jackson, he also told this investigator that he was the one who sold drugs to Crittenden. However, on cross-examination, Jackson was confronted by the investigator's notes, signed by Jackson, which did not include any statement that Jackson had sold drugs to Crittenden. Jackson also testified that on the second day of trial defense counsel "pulled me into the staircase and told me to take off, leave," and that he then left the courthouse.

Defendant's brother, James Arthur, also testified regarding defense counsel's request to Jackson to leave the courthouse:

> [Defense counsel] came outside [to the hall next to the courtroom] like in like a rush, like something had happened and told me to get him out of here, speaking of Robert Jackson, disappear. So I said I wanted to know why but I was more like thinking, well, if the lawyer said get him out of here, I think I better get him out of here. I'll find out later. I spoke to Mr. Jackson later on that day and he had told Mr. Jackson to disappear, get out of here....

Defense counsel gave the following account of his interview of Jackson and assessment of Jackson's value as a defense witness:

> Originally he looked like an excellent witness because he was able to give the defense what we needed essentially to establish that he was the seller. In fact I gave a proffer to the prosecutor. I even wrote it down because the prosecutor wanted to know what the proffer was. There was nothing in discovery to indicate that Robert Jackson was going to be the seller. When I interviewed him, he indicated that he was and I wrote that proffer for the prosecutor.
>
> However, he changed his story. When he learned that he was going to be a suspect in this, he said, oh, no, no, I wasn't the seller. I was there. I know that Michael Arthur didn't sell and it was at that point that he was interviewed by the Prosecutor's Office and my understanding of what he told them, although I never saw the notes that you just discussed, was that he basically told them that he didn't indicate he was the seller.

Defense counsel further explained: "I didn't know what [Jackson] was going to say and that was something I didn't want to risk."

Defense counsel also testified that he was "pleased" with Crittenden's testimony and "thought we were going to get a not guilty based on her testimony." In addition, he testified that Crittenden told him that defendant had been selling drugs that day, but Jackson was the one who made the sale to her.

Defense counsel gave the following account of Jackson's departure from the courthouse:

> I went out in the hallway and out of fairness to Mr. Jackson I said you are going to be arrested. Are you going to adhere to what you told me before that you were the seller? Otherwise, you better take off because you are about to be arrested but it's your call. I can't tell you what to do and at that point he literally got out in the nick of time because the entire building was scoured and the doors were shut downstairs and they didn't find him.

On cross-examination, defense counsel indicated that he suggested Jackson leave the courthouse because he was concerned Jackson would be arrested rather than because he made a strategic decision not to call Jackson as a defense witness and wanted to prevent the State from calling him as a rebuttal witness:

> I wanted to be fair to him. I felt like he was going to stick his neck out for [defendant]. I wanted to make sure he knew what he was getting into.

Defense counsel also testified that he made a tactical decision, in which defendant concurred, not to call his brother, James Arthur, as a witness and that he was unable to call defendant's two other proposed witnesses, Crystal Ross and Danielle Tomlinson, because defendant did not bring them to the courthouse.

Judge Barisonek delivered a comprehensive oral opinion denying defendant's petition. The judge found defense counsel's testimony that he did not tell Jackson to leave the courthouse but instead told him to decide for himself whether to stay to be incredible:

> I don't believe [defense counsel], in terms of his testimony, and I don't like to say this about a lawyer, but I have to be up front. That he never told him to leave, there is absolutely no doubt in my mind that he told this guy to leave and get out of here because he was going to hurt Robin Crittenden's testimony.

In making this credibility finding, Judge Barisonek relied partly on James Arthur's testimony that defense counsel told him to get Jackson out of the courthouse and partly on defense counsel's own testimony that he made a strategic decision after Crittenden testified to rely solely on her testimony in defending the case. Judge Barisonek also found that defendant concurred with defense counsel's decision not to call Jackson as a defense witness.

## II

Claims of ineffective assistance of counsel are generally governed by the standards set forth in *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and adopted by this Court in interpreting the New Jersey Constitution. *See State v. Allah,* 170 *N.J.* 269, 283, 787 *A.*2d 887 (2002); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). To be entitled to a new trial based on ineffective assistance of counsel, a defendant must make a two-part showing:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.
>
> [*Fritz, supra,* 105 *N.J.* at 52, 519 *A.*2d 336 (quoting *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693).]

In determining whether defense counsel's representation was deficient, " '[j]udicial scrutiny ... must be highly deferential,'

and must avoid viewing the performance under the 'distorting effects of hindsight.' " *State v. Norman,* 151 *N.J.* 5, 37, 697 *A.*2d 511 (1997) (quoting *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694). Because of the inherent difficulties in evaluating a defense counsel's tactical decisions from his or her perspective during trial, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694–95 (quoting *Michel v. Louisiana,* 350 *U.S.* 91, 101, 76 *S.Ct.* 158, 164, 100 *L.Ed.* 83, 93 (1955)).

In determining whether defense counsel's alleged deficient performance prejudiced the defense, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceedings." *Id.* at 693, 104 *S.Ct.* at 2067, 80 *L.Ed.*2d at 697. Rather, defendant bears the burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698; *see also State v. Harris,* 181 *N.J.* 391, 432, 859 *A.*2d 364 (2004).

## A.

Judged by these standards, there is no basis for concluding that defense counsel provided defendant ineffective assistance in failing to call Jackson as a defense witness. Initially, we reject defendant's contention that counsel failed to make a strategic decision not to call Jackson but instead allowed Jackson to make up his own mind whether to stay in the courthouse. There was sharply conflicting testimony concerning the circumstances of Jackson's departure from the courthouse. Although defense counsel testified that he "didn't know what [Jackson] was going to say

and that was something [he] didn't want to risk[,]" he also testified that he did not direct Jackson to leave the courthouse but instead, "out of fairness to Mr. Jackson," told him that he was "going to be arrested" and let Jackson "make the call" whether to stay. However, Jackson testified that defense counsel "told me to take off, leave," and James Arthur testified that defense counsel "told me to get him [Jackson] out of here." Judge Barisonek concluded that defense counsel's testimony that he did not tell Jackson to leave the courthouse was incredible and found that "[counsel] told [Jackson] to leave and get out of here because he was going to hurt Robin Crittenden's testimony." An appellate court must accept a trial court's factual finding if it is supported by sufficient credible evidence in the record. *State v. Locurto,* 157 *N.J.* 463, 472, 724 *A.*2d 234 (1999). Judge Barisonek's finding is supported not only by Jackson's and James Arthur's testimony but also the inherent improbability that an experienced criminal defense attorney such as defense counsel would think his duty of loyalty to his client was outweighed by an obligation to warn a potential defense witness that he could be arrested. See American Bar Association, *Standards for Criminal Justice Prosecution Function and Defense Function,* Standard 4–4.3 (3d ed.1993), which indicates that if a potential defense witness gives a statement that could incriminate the witness, "[i]t is not necessary for defense counsel . . . to caution the witness concerning possible self-incrimination" because defense counsel has a duty of paramount loyalty to his or her client.

 Judge Barisonek also correctly concluded that defendant failed to "overcome the presumption that, under the circumstances," defense counsel's strategic decision not to call Jackson as a defense witness " 'might be considered sound trial strategy.' " *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d 674–75 (quoting *Michel, supra,* 350 *U.S.* at 101, 76 *S.Ct.* at 164, 100 *L.Ed.* at 93). Determining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront. A trial attorney must consider what testimony a

witness can be expected to give, whether the witness's testimony will be subject to effective impeachment by prior inconsistent statements or other means, whether the witness is likely to contradict the testimony of other witnesses the attorney intends to present and thereby undermine their credibility, whether the trier of fact is likely to find the witness credible, and a variety of other tangible and intangible factors. See Roberto Aron & Jonathan L. Rosner, *How to Prepare Witnesses for Trial* §§ 2.02–.14 (2d ed.1998). Therefore, like other aspects of trial representation, a defense attorney's decision concerning which witnesses to call to the stand is "an art," *Strickland, supra*, 466 *U.S.* at 693, 104 *S.Ct.* at 2067, 80 *L.Ed.*2d at 697, and a court's review of such a decision should be "highly deferential," *id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694.

When defense counsel made the decision not to call Jackson, Crittenden already had testified for the defense that she told the police at the time of her arrest that Jackson, not Arthur, was the person who sold her drugs and that she again said Jackson was the seller at the time of her guilty plea, only identifying defendant as the seller after the trial judge stated he would reject her plea agreement if she persisted in her claim that Jackson was the true seller. Defense counsel, who had the opportunity to hear Crittenden testify, stated that he was "pleased" with her testimony and thought that defendant was likely to be acquitted based on that testimony.

When defense counsel first interviewed him, Jackson indicated he would corroborate Crittenden's identification of him as the seller, and defense counsel informed the prosecutor that Jackson would so testify. However, Jackson then retracted this admission and told defense counsel he was not the seller: "[H]e changed his story. When he learned that he was going to be a suspect in this, he said, oh, no, no, I wasn't the seller. I was there. I know that Michael Arthur didn't sell and it was at that point that he was interviewed by the Prosecutor's Office...." Defense counsel's testimony that Jackson retracted his admission that he was the

seller is supported by the prosecutor's representations in request-
ing an adjournment of the trial to afford her an opportunity to
locate Jackson:

> It wasn't until Counsel gave his witness list indicating that Robert Jackson initially
> would be the one who came in and said he was the one who sold the drugs to Miss
> Crittenden, and that he would be produced along with the other three witnesses for
> the State to talk to, then the next day when Mr. Jackson comes, Counsel says, "Oh,
> no, no, no, the proffer was not he was the one selling the drugs he was just there
> and she was coming to visit him," or something to that effect.

Thus, when defense counsel made the decision not to call Jackson
as a defense witness, it was reasonable for him to assume that
Jackson would testify, consistent with his second statement to
defense counsel, that he did not sell drugs to Crittenden, thus
directly contradicting Crittenden's trial testimony.[2]

Under these circumstances, there was a reasonable basis for
defense counsel's strategic decision not to call Jackson as a
defense witness because his testimony was more likely to harm
than to help defendant's case. This perception of the probable
impact of Jackson's testimony on the trial was obviously shared by
the prosecutor, who made her own strategic decision to call
Jackson as a rebuttal witness and strenuously urged the trial
court to delay the trial to afford her the opportunity to locate him.

We reject defendant's argument that defense counsel's decision
not to call Jackson as a defense witness is not entitled to the
"extreme deference" ordinarily extended to strategic decisions of
counsel, *Fritz, supra*, 105 *N.J.* at 52, 519 *A.2d* 336, because
defense counsel failed to interview Jackson or conduct other

---

[2] Contrary to the dissent, *infra* at 340 n. 6, 877 *A.2d* at 1203 n. 6, we believe
that defense counsel's testimony at the hearing on the petition and the prosecu-
tor's representations to the trial court in requesting an adjournment clearly
indicate that Jackson retracted his admission that he was the seller directly to
defense counsel and that defense counsel did not rely primarily upon what he
was told about Jackson's interview by the prosecutor's investigator in concluding
that Jackson's testimony would not be helpful to defendant. Significantly, the
prosecutor did not even mention the investigator's interview of Jackson in
requesting an adjournment. Rather, her request was based solely on defense
counsel's amended proffer of Jackson's proposed testimony on the second day of
trial.

investigation before trial. The record of the hearing on the petition for post-conviction relief indicates that defense counsel's decision not to call Jackson as a defense witness was based on his interviews of Jackson, his understanding of what Jackson told the prosecutor's investigator, and his assessment of the effectiveness of Crittenden's testimony. There is no basis for concluding that this strategic decision was affected by defense counsel's failure to conduct additional pretrial investigation. Therefore, his decision not to call Jackson is entitled to the same deference as any other strategic decision by defense counsel. *See Fritz, supra,* 105 *N.J.* at 61, 519 *A.*2d 336 ("[T]he obstacles facing defendant's attorney in terms of inability to prepare are insufficient to warrant a presumption of prejudice and to excuse the need for an inquiry into the actual conduct of the trial."); *see also State v. Chew,* 179 *N.J.* 186, 211, 844 *A.*2d 487 (2004); *State v. Bey,* 161 *N.J.* 233, 255–56, 736 *A.*2d 469 (1999), *cert. denied,* 530 *U.S.* 1245, 120 *S.Ct.* 2693, 147 *L.Ed.*2d 964 (2000); *State v. Savage,* 120 *N.J.* 594, 616–17, 577 *A.*2d 455 (1990).

B.

We also reject defendant's argument that defense counsel's representation was deficient in failing to call defendant's brother James Arthur to testify that defendant did not sell the drugs to Crittenden and that Jackson said he was the one who sold the drugs. Defense counsel testified that he decided, with defendant's concurrence, not to call Arthur because he believed Crittenden had been an effective witness and that Arthur would not be a credible witness:

> I was pleasantly surprised with [Crittenden's] testimony. I felt very confident after she testified. I talked it over with [defendant] and he agreed let's just take our chances with her testimony and the reason why I didn't call James Arthur was because, of course, the traditional problems that you have with bias. You have a brother. I didn't find him particularly credible when I interviewed him. I found him to be a bit—I wouldn't say that he was uncooperative. He was certainly there but he wasn't very forthcoming with information. He wasn't very specific with information. He would have I surmised testified that [defendant] was not the seller but in light of Miss Crittenden who was objective, unbiased, had no axe to

grind, I felt comfortable and confident with Miss Crittenden but I didn't make the final call, he [defendant] did.

Defense counsel also stated that he considered calling Arthur to testify that Jackson had initially admitted selling drugs to Crittenden but ultimately decided not to call Arthur for that purpose. Defense counsel was not asked why he made this decision. However, such testimony would have posed obvious strategic risks to the defense. Arthur's testimony that he had heard Jackson admit he sold the drugs to Crittenden would have been admissible as a declaration against penal interest, *see N.J.R.E.* 803(c)(25), but this evidence could have aided the defense only if the jury found Arthur to be a credible witness, and defense counsel had concluded that Arthur did not seem credible. Moreover, if Arthur had testified that Jackson said he was the one who sold the drugs to Crittenden, Judge Barisonek may have reconsidered his decision to deny the State's request for a delay in the trial to locate Jackson and produce him as a rebuttal witness. And if Jackson could not be located, the admission of Arthur's testimony that Jackson had admitted selling drugs to Crittenden would have permitted the State to present the prosecutor's investigator to testify as a rebuttal witness that when she interviewed Jackson, he had not claimed that he sold the drugs to Crittenden. *See N.J.R.E.* 806; *Norman, supra,* 151 *N.J.* at 33, 697 *A.2d* 511. Therefore, defense counsel could reasonably have concluded that the jury would be likely to discredit Arthur's testimony that Jackson had admitted selling drugs to Crittenden and instead credit testimony by the prosecutor's investigator that Jackson had not made such an admission.

## C.

Defendant also argues that defense counsel was ineffective in failing to visit the area where he was alleged to have sold drugs to Crittenden, failing to interview potential defense witnesses before trial and failing to call any defense witnesses in addition to Crittenden at trial. These arguments require only brief discussion.

Defense counsel testified that because the defense rested on Crittenden's testimony that Jackson, not defendant, was the seller and Jackson's possible corroborative testimony, he "felt pretty comfortable" in preparing the case without visiting the location of the drug transaction. Defendant does not suggest how the cross-examination of Crawford or any other part of the defense case could have been more effective if defense counsel had visited that location. Consequently, there is no basis for concluding that "there is 'a reasonable probability ... the result of the [trial] would have been different,' " if defense counsel's pretrial preparation had included such a visit. *Fritz, supra,* 105 *N.J.* at 52, 519 *A.*2d 336 (quoting *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698).

Defense counsel interviewed two of defendant's proposed witnesses, Jackson and James Arthur, during trial and made strategic decisions based on those interviews and the course of trial proceedings not to call them as defense witnesses. In the absence of evidence that defense counsel's failure to interview Jackson and Arthur before trial affected those decisions, there is no basis for concluding that this failure constituted ineffective assistance. We also are satisfied for the reasons previously discussed that defense counsel's strategic decisions not to call Jackson or Arthur did not constitute ineffective assistance.

The other two names on defendant's witness list were his fiancée Crystal Ross and Danielle Tomlinson. Although defense counsel did not interview them before trial, defendant told him Ross and Tomlinson would testify that they were present at the time of his arrest and that he was not selling drugs. Defendant also told defense counsel that "he had control over [these] witnesses" and would secure their presence at trial. However, defendant brought only Jackson and Arthur to the trial, and when the prosecutor inquired about interviewing Ross and Tomlinson, defense counsel informed her and Judge Barisonek in defendant's presence: "I couldn't get them here." Although defendant testified at the hearing on the petition for post-conviction relief, he did

not indicate why he failed to produce Ross and Tomlinson as defense witnesses, as he had told defense counsel he would do. Ross stated in her affidavit submitted in support of defendant's petition that "[defendant] told me that his lawyer said I wasn't needed[,]" and testified at the hearing on the petition that defense counsel told her after trial that she would not have been a credible witness because she was defendant's girlfriend. Therefore, it is reasonable to infer that defense counsel made a strategic decision not to call Ross as a witness. Moreover, in view of Ross's close personal relationship to defendant and the risk that her version of the drug sale would conflict with Crittenden's, there is no basis for concluding that this decision was objectively unreasonable or that there is a likelihood Ross's testimony would have changed the outcome of the trial.

Tomlinson was not produced as a witness at the hearing on the petition for post-conviction relief. Consequently, there is no evidence that she was even available to testify at the time of defendant's trial and thus no foundation for concluding that the failure to call her constituted ineffective assistance of counsel. *See Commonwealth v. Santiago,* 579 *Pa.* 46, 855 *A.2d* 682, 699 (2004) (holding that to establish ineffective assistance based on failure to call witness, defendant must show the witness was available at time of trial); *Valdes–Fuerte v. State,* 892 *S.W.2d* 103, 110 (Tex.Ct. App.1994) (same).

## D.

In addition to the ineffective assistance of counsel claims asserted by defendant, the dissent contends that defense counsel was ineffective in failing to obtain a signed written confession from Jackson, *infra* at 345–46, 877 *A.2d* at 1206–07, failing to have an impartial third party present at the interview of Jackson who could have testified about Jackson's original statement exculpating defendant, *infra* at 347, 877 *A.2d* at 1207, and failing, in the absence of such a third party witness, to disqualify himself as defendant's counsel and testify himself about Jackson's original

statement, *infra* at 347–48, 877 *A.*2d at 1207–08. None of these claims were raised by defendant in his petition for post-conviction relief, his arguments at the hearing on the petition or his appellate brief.

An appellate court ordinarily will not consider issues that were not presented to the trial court, *Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973), and an appellate court should be even more hesitant to raise an issue sua sponte that the parties have not had an opportunity to address, *see Robbiani v. Burke*, 77 *N.J.* 383, 395, 390 *A.*2d 1149 (1978). If defendant's petition had asserted that defense counsel provided ineffective assistance in failing to obtain a written confession from Jackson and failing either to have a third party witness present at his interview of Jackson or to disqualify himself and testify about Jackson's original statement, the prosecutor undoubtedly would have asked defense counsel additional questions relevant to those claims. Therefore, it is appropriate to confine appellate review of the denial of defendant's petition to the ineffective assistance claims asserted by defendant.

In any event, the dissent's assumption that Jackson would have been willing to provide defense counsel with a written confession or to repeat his statement that he sold the drugs to Crittenden in front of an impartial third party is speculative. Jackson's statement to defense counsel that he was the one who sold the drugs to Crittenden was made solely in the presence of defendant's brother, who could have exerted coercive pressure upon Jackson to make this assertion. The fact that Jackson retracted this assertion when he spoke to defense counsel the following day indicates that he was a skittish potential witness who may have been reluctant to reduce his inculpatory statement to writing or to repeat it in front of anyone other than defendant's brother. Furthermore, even if defense counsel had succeeded in obtaining a written confession or oral inculpatory statement in front of an impartial third party, the State could have impeached this admission by introduction of evidence that Jackson retracted the admis-

sion when defense counsel interviewed him the second time and that Jackson did not claim to have sold drugs to Crittenden when he was interviewed by the prosecutor's investigator. There also is a substantial likelihood that if defendant had presented such evidence, Judge Barisonek would have granted the prosecutor's application for a delay in the trial to afford her an opportunity to produce Jackson as a rebuttal witness. Therefore, even assuming defense counsel had been able to obtain a written or oral confession from Jackson, we are unable to conclude that there is a "reasonable probability" the outcome of defendant's trial would have been different. *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

We also consider it necessary to comment upon the dissent's assertion that "it is highly unusual that three individuals would be willing to come forward and offer testimony not only exonerating a defendant, but also implicating another person in the neighborhood [and] still more unusual that the person implicated would actually admit his guilt to clear a wrongfully charged defendant." *Infra* at 350, 877 *A.*2d at 1209. Since one of the three individuals referred to by the dissent was the defendant's brother and another his fiancée, we perceive nothing unusual in their effort to relieve defendant of responsibility for the crime by testifying that it was committed by another person. Defendant was unable to produce the third individual, Danielle Tomlinson, as a witness either at trial or at the hearing on the petition. Consequently, the record does not show that she was actually available to testify on defendant's behalf. Moreover, because Tomlinson never testified, the record does not indicate the nature of her relationship with defendant or any of the other persons interested in securing his acquittal. The record also does not indicate the precise nature of Jackson's relationship with defendant. However, defense counsel testified at the hearing on the petition that Crittenden told him that defendant and Jackson were both engaged in drug-dealing in the area of 969 West 3rd Street on the day of the drug sale to her. If defendant and Jackson were affiliated in this enterprise or defendant and his brother intimidated Jackson, it does not seem

implausible that Jackson might take responsibility for defendant's sale of drugs to Crittenden, or as defendant explained to defense counsel, "take the weight for being the seller," particularly if Jackson's sentencing exposure was substantially less than defendant's. What may appear highly unusual to appellate judges may not be so unusual in the culture of street-level drug dealers.

## III

A review of the complete trial transcript shows that defense counsel made an objectively reasonable decision regarding his overall strategy in defending the charges against defendant by relying primarily upon Crittenden's identification of Jackson as the actual seller and that he conducted this defense in a reasonably effective manner. Defense counsel told the jury in his opening that they were going to hear two completely disparate versions of the alleged drug sale to Crittenden, one by the State in the form of police officers' testimony and the other by one or two defense witnesses. Defense counsel told the jury that the State's case rested primarily on Detective Crawford's credibility and that it should not assign "undue consideration" to police officers' testimony because, if it did, "the scales of justice would shift ... improvidently in their favor." He therefore urged the jury to employ a "zero credibility test," under which any defense witness's testimony is given the same consideration as a police officer's testimony.

In his cross-examination of Detective Crawford, defense counsel brought out that Jackson resided at the 969 West 3rd Street address where Crawford allegedly observed defendant sell drugs and that Crawford had not made any effort to find out who lived there before trial. He also brought out that the police had not fingerprinted the KFC box or brown bag in which defendant's alleged stash of drugs was hidden or the vials containing the drugs. In addition, defense counsel suggested that Crawford had an ulterior motive to identify defendant as the seller, asking him,

"Did you ever say to my client, 'I told you I would get you'?" to which Crawford responded, "no."

In his cross-examination of Detective Jeffrey Carrier, the officer in the back-up unit who recovered the drugs behind the bushes, defense counsel asked whether Crittenden told him defendant was not the one who sold her drugs, and suggested that Carrier had no interest in hearing evidence that someone other than defendant was the seller:

> Q. Do you recall, also, that Miss Crittenden advised you at the time that she was being arrested by yourself and your partner that the guy that actually sold the drugs wasn't Mr. Arthur?
>
> A. No sir.
>
> ....
>
> Q. Is it possible that she told your partner that and you weren't at the location when she said that?
>
> A. It's possible.
>
> ....
>
> Q. And if she had told you that, of course, the seller wasn't Mr. Arthur you would have been interested to hear that. Right?
>
> A. Not really.
>
> Q. I thought so.

In cross-examining Carrier, defense counsel also brought out that the police had not retained either the KFC box or brown bag in which the drugs were located.

In his summation, defense counsel reminded the jury that the State's case essentially turned on Detective Crawford's credibility and that Crawford's testimony should not be accepted simply because he is a police officer:

> [W]e don't put the police officer on a pedestal, we put him at ground zero and either the barometer goes up or down based on your determination of his credibility. And based on this particular case I'm asking you, as I've asked you at the beginning of the case, to assume that all witnesses are equal, okay, and judge them according to what the testimony reflects....

Defense counsel then argued that the jury should find Crittenden credible because she had no motive to lie about Jackson's identity as the seller, and she repeatedly told the police from the time of her arrest that Jackson, not defendant, was the seller:

You have to analyze her motives and one of the bases to assess whether she is credible and Detective Crawford lied to you is whether or not she tried to announce that truth before. Did she ever do it before. We know she did. She did it at the scene and I think one of the officers indicated she was trying to say something, she was doing a lot of talking and no doubt she indicated that Mr. Arthur was not the person who sold her drugs, no doubt about it.... Plainfield police don't want to hear this. They have their own agenda. It's not for me to say why a particular police officer has an agenda or an axe to grind over a particular suspect and why he would pin a rap on someone rather than the person who actually did it. I don't know, but I do know that Miss Crittenden made it clear over, and over again that, "You have the wrong guy."

Defense counsel also pointed out that Crittenden initially indicated Jackson was the seller when she pled guilty to purchasing the drugs and that she identified defendant as the seller only after the prosecutor and trial judge told her she had to name him to get the benefit of her plea bargain:

She indicated, "It's Robert Jackson," at the beginning. Whoops? "What do you mean those aren't the rules? I can't say the truth"? No.

The Court takes a break, comes back, she confers with her attorney and the Prosecutor says, "Well, let's try this again, Miss Crittenden. Remember the deal here? Okay"? And suddenly she has a recollection that it's Michael Arthur who now is the seller. It's a game, that is all it is, it's not a very good game, it's not something which I would ascribe much integrity to because I'm not sure it has much to do with the truth. She was trying to say, "I got the wrong guy, but if you need me to say Arthur is the guy to get the deal I'll say it," but isn't this ridiculous, it's literally out of the mouths of babes in a way. Here is this innocent person to the system, okay, she has prior convictions and she's been through the system to some degree, but she does not—she is not a lawyer, she is not a Judge, she is someone of limited education and she is telling everyone, "There is something not cool here. You know, this is the guy who did it," but you know he didn't do this. "Can't I just admit my guilt? Isn't that good enough for the State"? But it's not. Why did they take a break? They took a break to get the story straight so she could do the dance, and she does the dance. It's all this case is about and you will have to make the call.

In addition, defense counsel argued that if the jury had any doubt about defendant's guilt based on Crittenden's testimony, they should acquit him because the State had the burden of proving his guilt beyond a reasonable doubt:

[Y]ou have a reasonable certainty that you are comfortable and confident that this man was the person that sold the drugs. You have to feel that, you have to believe that, otherwise if you don't have it you cannot convict him.... Based upon what Miss Crittenden said, who is what I would submit is a whistle blower, that is what she is, she is basically unleashing the truth about a dirty system, she is telling you that and you have an obligation in this case only, I'm not talking about the large

picture of what happens in society, I'm talking about how it affects this man's life to acquit him based upon her testimony, which is the truth.

Thus, defense counsel provided defendant with an aggressive and reasonably competent defense of the charges against him. His effort to create reasonable doubt concerning Crawford's identification of defendant as the person who sold drugs to Crittenden through Crittenden's testimony that Jackson was the actual seller would have been seriously undermined if Jackson had taken the stand and denied he was the seller. Consequently, defense counsel made a reasonable strategic decision to avoid this risk by not calling Jackson.

## IV

This opinion should not be read to condone a defense attorney's failure to interview prospective defense witnesses until the day of trial. An attorney assigned the solemn responsibility of representing a person charged with a serious crime has a professional obligation to interview prospective witnesses and conduct other appropriate pretrial investigation a sufficient time before trial to formulate a defense strategy that affords the accused the best possible opportunity to secure an acquittal. Although the record does not indicate whether defense counsel bears sole responsibility for his failure to interview Jackson or other potential defense witnesses before trial or whether that failure reflects systemic problems within the Public Defender's office, the Public Defender has ultimate responsibility for assuring that criminal defendants are provided adequate representation.

 But even though defense counsel's pretrial preparation fell short of the professional standards to which the Public Defender should require adherence, the purpose of the constitutional guarantees of effective assistance of counsel "is not to improve the quality of legal representation." *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. "The purpose is simply to ensure that criminal defendants receive a fair trial." *Ibid.; see also Waters v. Thomas,* 46 *F.*3d 1506, 1512 (11th Cir.1995) (en banc) ("The test [of ineffective assistance] has nothing to do with

what the best lawyers would have done. Nor is the test even what most good lawyers would have done.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.") (quoting *White v. Singletary*, 972 *F.*2d 1218, 1220–21 (11th Cir.1992), *cert. denied*, 514 *U.S.* 1131, 115 *S.Ct.* 2008, 131 *L.Ed.*2d 1008 (1995)), *cert. denied*, 516 *U.S.* 856, 116 *S.Ct.* 160, 133 *L.Ed.*2d 103 (1995). Our review of the trial record shows that defense counsel made an objectively reasonable decision not to call Jackson as a defense witness based on his assessment of the effectiveness of Crittenden's trial testimony and his justifiable concern that Jackson could undermine Crittenden's testimony by denying he was the one who sold her drugs. Therefore, we are satisfied that defense counsel's representation of defendant fell "within the wide range of reasonable professional assistance" to which an accused is entitled and that defendant received a "fair trial." *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. This is all we need to decide to sustain the denial of defendant's petition.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, dissenting.

The most seasoned trial attorney cannot do justice to his client's cause if he does not prepare for trial. If he fails to conduct an investigation, or interview and take statements from critical witnesses, or get those witnesses on the stand, then the attorney's courtroom performance, however skillfully displayed, is but an illusion of adequate representation. Courtroom tactical decisions made by an attorney who has not engaged in minimal trial preparation often are distorted, rushed, wrongheaded—and at the expense of the client.

Defendant Michael Arthur likely sits in prison convicted of drug distribution charges, not because of the strength of the State's case against him, but rather because of the ineffectiveness of his State-appointed attorneys. Arthur pled not guilty to the indictment, which alleged that he had distributed drugs on June 23, 1998. He had a formidable wrongful identification defense, but

the jury never heard from the witnesses who would have corroborated that defense due to his attorneys' failure to conduct an investigation or prepare for trial. The Public Defender's Office and pool counsel had represented Arthur for fifteen months, and yet Arthur did not meet his assigned attorney until the pretrial conference, just two weeks before trial. Although he supplied his attorney with the names of four witnesses to support that defense, his attorney did not interview a single one before trial. His attorney did not subpoena key exculpatory witnesses for trial. Moreover, when his attorney met in the courthouse with the person who admitted to having committed the crime—the person who came to testify to Arthur's innocence—the attorney took no statement from him, did not call him as a witness, and allowed him to leave. As a result of his defective trial preparation, the attorney called only one witness to challenge the credibility of the State's case.

Arthur did not have the financial means to retain his own attorney. He had to rely on the State to appoint competent counsel for him. The State provided him with an attorney who, however experienced, failed to take the most basic preparatory steps to assure his client a fair trial. Because I cannot agree with the majority that Arthur received the effective assistance of counsel guaranteed to him by our federal and state constitutions, I must dissent.

## I.

The trial in this case was reduced to a credibility contest between two witnesses. Detective Andre Crawford testified that on June 23, 1998, while conducting surveillance at 969 West 3rd Street in Plainfield where a group of people had congregated, he observed Michael Arthur place "some items" behind bushes. Later, Arthur retrieved an "item" from the bushes and engaged in a hand-to-hand transaction with Robin Crittenden. Believing that he had witnessed a drug sale, Detective Crawford called in back-up police officers, who arrested both Arthur and Crittenden at the scene. When the police approached Crittenden, she dropped a

vial of drugs. The police then found approximately forty-five additional vials in the bushes.

Arthur presented the defense of mistaken identification through Robin Crittenden, his sole witness. Crittenden testified that she was the one Detective Crawford observed purchasing drugs, but that Robert Jackson, not Arthur, was the actual seller. She added that Jackson lived at 969 West 3rd Street and that the sale occurred in Jackson's yard. After she was taken into custody, Crittenden told the police officers that they had mistakenly arrested Arthur. She explained to the officers at the stationhouse that Arthur "didn't serve [her], that this other guy had served [her]," but the officers "didn't want to hear that." Although Crittenden "kept telling them" that Arthur was the wrong man, they humored her, saying, " 'yeah, right.' " One of the arresting officers, Detective Jeffrey Carrier, testified that although he did not recall Crittenden making a statement exculpating Arthur, he would "not really" have been interested even had she made it.

At the time Crittenden pled guilty to possession of a controlled dangerous substance pursuant to a plea agreement with the State, she initially named Jackson on the record as the drug dealer. However, the prosecutor refused to accept that account as a factual basis for the plea. The prosecutor threatened to withdraw a favorable sentence recommendation unless Crittenden gave the version that the State believed to be true—that Arthur sold her the drugs. The court then called a recess. Because she was facing a five-year prison term with a three-year parole disqualifier, Crittenden stated that she "had to tell them [that the seller] was Michael Arthur." She, therefore, falsely implicated Arthur to get the deal.[1]

During Arthur's trial, the prosecutor effectively impeached Crittenden with both her plea statement incriminating Arthur and her criminal record. The jury rejected Crittenden's testimony, ac-

---

[1] The majority states that "defense counsel testified ... that Crittenden told him that [Arthur] and Jackson were both engaged in drug-dealing in the area of

cepted that of Detective Crawford, and convicted Arthur of a number of drug offenses, including second-degree distribution of cocaine within 500 feet of a public park in violation of *N.J.S.A.* 2C:35–7.1. Arthur filed a post-conviction relief (PCR) petition, claiming that his attorneys denied him his federal and state constitutional rights to the effective assistance of counsel by failing to call to the stand witnesses who were available to support his defense.

The PCR record reveals that sometime around January 1999, the Public Defender's Office first undertook the representation of Arthur. Over the course of the next fourteen months, little, if anything, was done to prepare the case for trial. The Assistant Deputy Public Defender assigned to the case did not interview or take statements from witnesses, visit the scene of the drug sale, take photographs, or arrange for an investigator to work up the case.[2] Although the name "Robert Jackson" was known as early as

---

969 West 3rd Street on the day of the drug sale to her." *Ante* at 328, 877 *A.*2d at 1196. Yet Crittenden never testified to that effect. In fact, her testimony in no way implicates Arthur as a drug seller, much less as the person who sold drugs to her. To the contrary, Crittenden exculpated Arthur to the police, at the start of her plea, in a letter given to Arthur's girlfriend, and at the trial.

The portion of the record on which the majority presumably relied was defense counsel's PCR testimony. There, defense counsel, in passing, testified that "[o]ne thing you may not know is that the main witness in the case who did testify for the defense, Robin Crittenden, indicated Michael Arthur was selling drugs that day, he just didn't conduct this sale." Although counsel's remark reinforced that Arthur was not involved in the sale purportedly witnessed by Detective Crawford, he did not elaborate on when or where Crittenden made the statement concerning Arthur's involvement in drugs. Counsel never testified that Crittenden personally told him that Arthur was a drug dealer. One could fairly infer that defense counsel's remark was based on an improper recollection of Crittenden's trial testimony. After all, counsel had difficulty remembering when he first met his client, testifying initially that he was introduced to Arthur on the day of trial. Only after being corrected by the PCR court did counsel recall that his first meeting with his client was two weeks before trial.

2 Notably, the PCR court "did not see any independent investigation. In other words, [it did not] see anything from any detectives from the Public Defender's Office where they physically went out and did interviews of people."

January 1999, when Crittenden implicated Jackson as the seller in her plea colloquy, that lead went unexplored.

Approximately one month before trial, the Public Defender's Office transferred Arthur's case to a pool attorney. The file given to counsel did not contain any defense investigative reports, statements of witnesses, or photographs. Defense counsel first met his client at the pretrial conference on March 20, 2000. The pretrial conference, ordinarily, is the point of no return before trial—not the time for an attorney to make his initial acquaintance with his client. Rule 3:9-1(e) requires the court to conduct a pretrial conference and "determine[ ] that discovery is complete; that all motions have been decided or scheduled . . . and that all reasonable efforts to dispose of the case without trial have been made. . . ." On that date, the defense attorney, typically, would be required to give the State a witness list. Because of counsel's late arrival to the case, the court gave him a week to present that list. The court, however, ordered that the trial proceed in just two weeks—on April 3—and denied defense counsel's request for an adjournment.

I note in passing that defense counsel does not bear sole blame for the breakdown of the system in this case. In light of his eleventh-hour entrance and the Public Defender's Office's four-teen-month neglect of Arthur's file, an adjournment should have been granted. Giving defense counsel additional time to prepare would have been a small price to pay to ensure that Arthur received a fair trial.

What did counsel do with the two weeks allotted to him? At the PCR hearing, he could not recall discussing the case with anyone other than Arthur. He never consulted prior defense attorneys about their work on defendant's case. He did not visit the crime scene. He did not request the assignment of an investigator from the Public Defender's Office to photograph the scene or, more importantly, to take statements from witnesses who would have supported Arthur's defense. Although Arthur provided his attorney with the names, addresses, and telephone numbers of four

eyewitnesses who were ready to verify under oath that Robert Jackson was the actual seller, he did not meet with one of those witnesses before trial. Similarly, defense counsel never subpoenaed those witnesses to ensure their presence in court. He left it entirely up to his client not only to get statements from witnesses supporting his defense but also to get those witnesses to court.

Before trial, defense counsel provided the prosecutor with a list containing the names of four witnesses who were present at the time of Arthur's arrest: Crystal Ross, Robert Jackson, Danielle Tomlinson, and James Arthur.[3] Counsel spoke with Jackson and James Arthur in the courthouse only after the trial began, and only for a matter of minutes. Those four uncalled witnesses later provided affidavits, explaining that on the day of defendant's arrest, Crittenden purchased drugs from Jackson, not Arthur.

In his affidavit, Jackson swore that "Michael Arthur was falsely accused of selling drugs to Robin Crittendon [sic]. I was the one that made the transaction with Robin. I gave her drugs for money." In his PCR testimony, Jackson stated that on the opening day of Arthur's trial, he first met defense counsel in the hallway of the courthouse where they spoke for one to two minutes. There, he confessed to the crime, but counsel took no signed statement. Instead, he allowed Jackson to be interviewed alone by a prosecutor's detective who then prepared a short

---

[3] It is unclear from the record precisely when Arthur handed the list over to counsel. Arthur claims that he did so at the March 20, 2000 conference. Defense counsel did not recall receiving the list until the trial date. Even if counsel were correct, however, Jackson's name was identifiable as a potential witness over a year before the trial. As discussed *supra*, at Crittenden's 1999 plea session, she originally identified Jackson as the drug seller.

Defense counsel could have learned about Jackson's existence in early 1999 simply by reading the co-defendant's plea transcript. Counsel also indicated at the PCR hearing that "there were three lay witnesses listed on the police report," providing yet another source he could have investigated had he wanted to interview witnesses before Arthur's trial. In light of those facts, the precise date on which counsel received the witness list becomes less important, and his ineffectiveness for not meeting with Jackson before Arthur's trial becomes self-evident.

statement, in question and answer format, which Jackson signed. In that statement, Jackson denied that the drug stash found in the bushes was his. Jackson, however, was never asked whether he sold drugs to Crittenden, and he did not volunteer that information to the detective.[4] Jackson insisted that he always was prepared to admit that he sold the drugs to Crittenden. Jackson recalled that on the second day of trial defense counsel "pulled [him] into the staircase and told [him] to take off."

At the PCR hearing, defense counsel confirmed that Jackson told him in a hallway interview that he was the one who had sold the drugs to Crittenden, and that Jackson then had a session with the detective. Afterwards, counsel learned from the prosecutor that "Jackson was going to be arrested." The prosecutor told him, "[w]e feel we have enough." Defense counsel explained that "things were unfolding very . . . fast and in hindsight unfairly or fairly [he] wanted to be fair to" Jackson. If Jackson was going to stick his neck out for Arthur, counsel felt that he should "make sure [Jackson] knew what he was getting into" before he was "cuffed."

According to defense counsel, he felt obliged to warn Jackson that he would face arrest if he testified that he was the one who sold drugs to Crittenden. Counsel stated:

> I went out in the hallway and out of fairness to Mr. Jackson I said you are going to be arrested. Are you going to adhere to what you told me before that you were the seller? Otherwise, you better take off because you are about to be arrested but it's your call. I can't tell you what to do. . . .

Based on those remarks, Jackson fled the courthouse.[5]

Although defense counsel was not present at Jackson's proffer with the detective and did not review the State's notes from that

---

[4] *Although Jackson steadfastly maintained that he had sold the drugs to Crittenden,* he denied both in the statement to the detective and in his affidavit that he was the owner of the stash of drugs found by the police.

[5] The majority takes judicial notice of "the inherent improbability that an experienced criminal defense attorney such as defense counsel would think his duty of loyalty to his client was outweighed by an obligation to warn a potential

meeting, he testified that Jackson, in speaking with the detective, "changed his story." [6] It was counsel's understanding that Jackson, upon learning that he was a suspect, denied having committed the crime to the detective. Of course, had defense counsel looked at the detective's notes, he would have learned that Jackson only denied possessing the drugs found in the bushes.

The jury never got to hear Jackson's confession because defense counsel did not get a signed statement from Jackson or move to disqualify himself from the case so that he could testify to Jackson's confession. Accordingly, the jury never heard the piece of evidence most damaging to the State's case—that Jackson incriminated himself and cleared Arthur.

In addition to Jackson, defense counsel had available three other witnesses to corroborate Crittenden's testimony that Arthur did not sell the drugs. In an affidavit, Danielle Tomlinson stated that "[i]n the summer of 1998 Michael [Arthur] had gotten locked up for something he did not do. I know because I was outside and present on that date." Shortly before Arthur's arrest on West Third Street, Tomlinson "notice[d] a female and Robert Jackson engaged in a conversation and some sort of exchange." While that was occurring, Arthur was seated on top of a van eating food. He later was arrested.

Similarly, at the PCR hearing, Crystal Ross, defendant's girlfriend, confirmed that if called as a witness at Arthur's trial, she

---

defense witness that he could be arrested." *Ante* at 320, 877 *A.2d* at 1191. However, when reviewing a PCR petition, we do not assume that counsel prepared and investigated a case. *See Marshall v. Hendricks*, 307 *F.*3d 36, 109 (3d Cir.2002), *cert. denied*, 538 *U.S.* 911, 123 *S.Ct.* 1492, 155 *L.Ed.*2d 234 (2003). We examine the evidence to determine whether counsel was ineffective. Likewise, there is no basis to assume that defense counsel complied with his professional responsibilities, particularly in light of a record that strongly suggests otherwise.

[6] Contrary to the suggestion in the majority opinion, *ante* at 321–22, 877 *A.2d* at 1192, there was no direct testimony that Jackson told defense counsel that he was not the seller.

would have testified to the information that she provided in her affidavit. Ross stated in her affidavit that she saw Crittenden "walk up to Robert Jackson who was next to" Arthur. At that point, "[Crittenden] and [Jackson] began to exchange something by hand." Immediately following that transaction, the "narcs jumped out and grabbed Michael [Arthur] and Robin [Crittenden]." While "Robert [Jackson] walked off to the corner store," Ross witnessed Crittenden "crying and yelling, 'why are you[ ] locking [Arthur] up, he didn't give me anything.' " Ross was "100% sure that it was Robert Jackson who made the transaction."

James Arthur, defendant's brother, also testified at the PCR hearing. He recalled telling defense counsel in the courthouse that he had witnessed Jackson making the drug sale to Crittenden. James also witnessed Jackson's hallway confession to his brother's attorney. However, defense counsel chose not to put James Arthur on the stand in his brother's trial. Jackson, Tomlinson, Ross, and James Arthur were witnesses whose names were known by counsel and who would have corroborated the account of the sole defense witness—Robin Crittenden.

Because defense counsel did not call any of the four witnesses who would have corroborated Crittenden's account, the jury was left to ponder the prosecutor's assertion in summation that Robert Jackson was someone Crittenden had "made up." Not surprisingly, Arthur was convicted.

## II.

In a criminal case, the accused is guaranteed the effective assistance of counsel by the Sixth Amendment of the United States Constitution. *Strickland v. Washington,* 466 *U.S.* 668, 685–86, 104 *S.Ct.* 2052, 2063, 80 *L.Ed.*2d 674, 692 (1984). "The purpose" of that guarantee "is simply to ensure that criminal defendants receive a fair trial." *Id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. To make out a case of ineffective assistance of counsel, a defendant must comply with a two-part test. *Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. The defendant must show

first that his attorney "made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" and second "that the deficient performance prejudiced the defense." *Ibid.*[7]

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" because of the recognition that "[t]here are countless ways to provide effective assistance in any given case." *Id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694–95. In that regard, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. . . ." *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. On the other hand, "strategic choices made after less than complete investigation" are not entitled to the same degree of deference. *Id.* at 690–691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *id.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695, and the "failure to do so will render the lawyer's performance deficient," *State v. Savage,* 120 *N.J.* 594, 618, 577 *A.*2d 455 (1990).

"Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *United States v. Gray,* 878 *F.*2d 702, 711 (3d Cir.1989). For example, "[t]he complete failure to investigate potentially corroborating witnesses" cannot be attributed to trial strategy. *United States v. Debango,* 780 *F.*2d 81, 85 (D.C.Cir. 1986); *see also Hoots v. Allsbrook,* 785 *F.*2d 1214, 1220 (4th Cir.1986) ("Neglect even to interview available eyewitnesses to a crime simply cannot be ascribed to trial strategy and tactics."). To be entitled to deference, a decision not to pursue a particular

---

[7] In *State v. Fritz,* we adopted the federal approach to ineffective assistance of counsel. 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987).

line of investigation must be based on reason, not dereliction of duty.

Federal courts have not hesitated to overturn convictions for ineffectiveness of counsel when so-called strategic trial decisions were based on inadequate or deficient pretrial investigation or preparation. *See, e.g., Wiggins v. Smith,* 539 *U.S.* 510, 536, 538, 123 *S.Ct.* 2527, 2543, 2544, 156 *L.Ed.*2d 471, 494, 495 (2003) (reversing denial of *habeas* petition and refusing to defer to attorneys' decisions because "counsel were not in a position to make a reasonable strategic choice" without reasonable investigation); *Williams v. Taylor,* 529 *U.S.* 362, 367, 396, 120 *S.Ct.* 1495, 1499, 1514, 1515, 146 *L.Ed.*2d 389, 402, 419, 420 (2000) (reversing denial of *habeas* and finding that failure to conduct a thorough investigation, contact witnesses, and introduce helpful evidence constituted ineffective assistance); *United States ex rel. Hampton v. Leibach,* 347 *F.*3d 219, 251–53, 255, 260 (7th Cir.2003) (affirming grant of *habeas* on ineffective assistance grounds because counsel acted objectively unreasonably in failing to contact witnesses whose names defendant provided, and in failing to make effort to locate other eyewitnesses); *Lord v. Wood,* 184 *F.*3d 1083, 1093, 1095 (9th Cir.1999) (holding that failure to conduct more than "cursory investigation" of three potential witnesses, and to call them to stand, "constitute[s] deficient performance" by counsel prejudicing defendant), *cert. denied sub nom. Lambert v. Lord,* 528 *U.S.* 1198, 120 *S.Ct.* 1262, 146 *L.Ed.*2d 118 (2000); *Sanders v. Ratelle,* 21 *F.*3d 1446, 1455–57 (9th Cir.1994) (holding that representation was ineffective because counsel "failed to conduct even the minimal investigation that would have enabled him to come to an informed decision about ... whether to call" confessing witness, "did not attempt to obtain a statement from" the witness, and then "directed [the witness] to leave the courthouse as quickly as possible").

A case with striking similarities to the present one is *United States v. Gray, supra,* 878 *F.*2d 702 (3d Cir.1989). In that case, the Third Circuit overturned a possession of a firearm conviction

because counsel's inadequate pretrial investigation violated the defendant's Sixth Amendment right to the assistance of counsel. *Id.* at 714. In *Gray, supra,* the police found the defendant in possession of a gun and bullets outside a bar. *Id.* at 704–05. The defendant admitted that he had the gun and bullets in his pocket, but claimed that he had taken the weapon and ammunition from a person with whom he had been fighting moments before the police arrived on the scene. *Id.* at 704–05, 706–07. Although the defendant and his brother testified to that account, there were other available witnesses to corroborate the story. *Id.* at 706–08.

At a post-trial hearing, defense counsel admitted that he relied on the defendant to find potential witnesses. *Id.* at 708–09. The attorney did not visit the scene, attempt to locate potential witnesses on his own, or hire an investigator to search for and interview witnesses. *Id.* at 709. Nor did he subpoena witnesses to trial. *Ibid.* Defense counsel expected two favorable witnesses to appear at trial, but on " 'the day of the trial they weren't there.' " *Ibid.* Accordingly, the trial went forward, and the defendant was convicted by a jury unaware that a number of witnesses possessed exculpatory information. *Id.* at 704, 712–13.

The Third Circuit held that counsel's representation of the defendant was ineffective. *Id.* at 714. The court noted that the defendant's "counsel had the names of at least four witnesses, including [one] who had witnessed the altercation [at issue], yet he made no effort to contact any of these known witnesses." *Id.* at 712. Moreover, the court held that the defendant's "reluctance to subpoena witnesses ... did not absolve [counsel] of his independent professional responsibility to investigate what information these potential witnesses possessed, even if he later decided not to put them on the stand." *Ibid.* "Counsel offered no strategic justification for his failure to make any effort to investigate the case, and indeed he could have offered no such rationale." *Id.* at 711. Ultimately, the Third Circuit held that "counsel's behavior was not colorably based on tactical considerations but merely upon

a lack of diligence," and determined that defendant should be granted a new trial. *Id.* at 712, 714.

On another recent occasion, the Third Circuit has found inadequate preparation to constitute ineffective representation, entitling the defendant to federal relief. *See Marshall v. Hendricks,* 307 *F.*3d 36, 102, 109 (3d Cir.2002) (overturning district court's rejection of *Strickland* claim where defense attorney "fail[ed] to contact witnesses who were prepared and willing to provide relevant mitigating evidence" and state court's opinion unreasonably "assume[d] that counsel had prepared and investigated"), *cert. denied,* 538 *U.S.* 911, 123 *S.Ct.* 1492, 155 *L.Ed.*2d 234 (2003); *see also Marshall v. Hendricks,* 313 *F.Supp.*2d 423, 428, 443–44 (D.N.J. 2004) (noting in same case on remand that counsel's "failure to investigate [was] particularly troubling given the apparent plethora of potentially useful mitigation witnesses available[,]" and holding that *habeas* grant was warranted).

In light of those principles, it should be clear the decisions made by defense counsel in this case were neither reasonable nor strategic.

## III.

Because of his failure to prepare for trial, counsel's purported "strategic choice" not to call four corroborating witnesses, including one who had confessed to the crime, was robbed of its "presumption of competence." *State v. Chew,* 179 *N.J.* 186, 218, 844 *A.*2d 487 (2004) (internal quotations omitted).

Defense counsel's ineffectiveness becomes clear when measured against what a minimally competent criminal defense attorney would have done under like circumstances. First, such an attorney would have met with his witnesses before trial and obtained signed written statements.[8] *See Sanders, supra,* 21 *F.*3d at 1457

---

[8] The majority contends that Arthur did not raise defense counsel's failure to take a statement from Jackson as an element of his ineffective assistance of

(finding ineffective assistance where counsel "failed to do what any competent lawyer would do when a witness indicates directly or indirectly that he, and not the lawyer's client, is guilty. He did not attempt to obtain a statement from [the confessor] confirming his admission of guilt."). That oversight was particularly critical with respect to Jackson, who confessed to committing the crime and who predictably might have had second thoughts when contemplating the penal consequences. Had defense counsel taken a signed statement from Jackson, his confession could have been admitted into evidence under *N.J.R.E.* 803(a)(1)(A) regardless of whether Jackson later disavowed it on the stand. Jackson's confession also would have been admissible under *N.J.R.E.* 803(c)(25) as a statement against interest, even if Jackson had not been called as a witness. Statements against penal interest "are deemed inherently trustworthy and reliable" because individuals

---

counsel claim and, therefore, it should be ignored now. *Ante* at 326–27, 877 A.2d at 1195. Arthur's PCR brief, however, sufficiently touches the issue to bring it before this Court. His brief submitted to the PCR court contains the following passage:

> [i]mmediately prior to trial the defendant on his own contacted the witnesses and made them available to defense counsel. Among the witnesses was Robert Jackson who admits that he "served" Robin Crittenden the drugs that were found in her possession. Mr. Jackson was present in court for two days waiting to testify at the request of the defendant. *No statement was taken from this witness nor was he interviewed prior to showing up in court on the day of trial.*
>
> [ (Emphasis added).]

The brief then proceeds to argue that counsel's assistance was ineffective under *Strickland, supra.*

Furthermore, defense counsel's delegating to his client the responsibility for taking witness statements was discussed at the PCR hearing. The State knew that defense counsel's overall failure to investigate and prepare for trial was at the heart of the PCR claim and is not disadvantaged by this Court's addressing the obvious. However, even if Arthur had not raised this precise sub-issue, we would not be required to put on appellate blinders. Defense counsel's ineffective assistance generally—and his inadequate preparation in particular—are unquestionably before this Court. We also are entitled to "notice plain error not brought to the attention of the trial or appellate court." *R.* 2:10–2. This court should not ignore counsel's conduct that manifestly fell below acceptable standards of performance and that denied Arthur a fair trial.

ordinarily will not assert or admit to facts that will subject them to a criminal prosecution unless they are true. *State v. White,* 158 *N.J.* 230, 238, 729 *A.*2d 31 (1999). Defense counsel should have realized the importance of recording Jackson's confession in the event that he got cold feet.

Second, prudence and common sense suggest that a third person should be present when an attorney takes a statement from a witness who is admitting to a crime and who might have reason to change his story later. In *State v. Dayton,* the Appellate Division "express[ed its] concern as to why defense counsel would interview [key witnesses to an] alleged offense without the presence of an investigator or some third party (other than defendant) who could be called to testify as to exculpatory information they conveyed." 292 *N.J.Super.* 76, 86, 678 *A.*2d 299 (App.Div.1996). Had defense counsel reduced Jackson's confession to writing in the presence of a third person, it would have been admissible through that person, and Jackson's flight could have been explained as the act of a man fleeing the arm of justice.

Having failed to take any of those measures, counsel had yet another opportunity to salvage his client's case—by stepping down and making himself a defense witness.[9] He possessed the most powerful evidence in defense of his client, Jackson's confession. Because counsel had information vitally important to the success of his client's case and because he made himself a necessary witness as a result of not having an impartial person present when Jackson confessed, he should have withdrawn as counsel. *See Dayton, supra,* 292 *N.J.Super.* at 86, 678 *A.*2d 299; *see also RPC* 3.7. Both federal and state courts have recognized that attorneys

---

[9] In fact, there was another option available to defense counsel apart from taking the extreme step of removing himself from the case. He could have presented the testimony of defendant's brother, James Arthur. James Arthur was a witness to both the drug transaction involving Crittenden and to Jackson's later confession and flight from the courthouse. Of course, James Arthur would have been testifying for his brother and ripe for impeachment. For that reason, the better option, and perhaps only option, would have been for counsel to step down and become a witness.

have a duty to step down as counsel when their testimony becomes critical to a client's case. *See, e.g., United States v. Kliti,* 156 *F.*3d 150, 156 (2d Cir.1998) ("When faced with an attorney as a sworn or unsworn witness, the proper recourse is to disqualify the attorney, not to exclude the testimony."); *United States v. Vereen,* 429 *F.*2d 713, 715 (D.C.Cir.1970) (holding that where defendant could impeach victim's harmful statements only through testimony of defendant's trial counsel, counsel's withdrawal "was manifestly appropriate"); *State v. Blake,* 157 *Conn.* 99, 249 *A.*2d 232, 234 (1968) (reversing conviction where trial court refused to permit defendant's attorney, who wished to testify on defendant's behalf, to withdraw from case); *Gradsky v. State,* 243 *Miss.* 379, 137 *So.*2d 820, 822 (1962) ("[R]efusal to permit defendant the right to introduce his attorney as a witness when he had vital evidence in favor of the defendant was reversible error."); *People v. Tillman,* 179 *A.D.*2d 886, 579 *N.Y.S.*2d 197, 198 (1992) (holding that counsel's failure to question witness about prior admission that defendant never sold him drugs was prejudicial error, and noting that, if witness had refused to acknowledge admission before jury, "defense counsel could have sought ... disqualification and ... testified concerning the statement made to him").

The prejudice resulting from the lack of investigation and preparation by Arthur's attorneys, including the Public Defender's Office, is obvious. Had Jackson testified or given a statement, the jury would have learned about his confession that cleared Arthur of selling drugs to Crittenden.[10] A confession that is exculpatory

---

[10] The majority characterizes Jackson as "a skittish potential witness" and rejects the possibility that he would have signed a written confession on Arthur's behalf had defense counsel made that request. *Ante* at 327, 877 *A.*2d at 1195. The majority likewise suggests that Jackson would not have testified favorably for defendant had he been called to the stand at trial. That argument flies in the face of what we know did occur. Jackson gave a sworn statement in the form of an affidavit admitting that he sold the drugs to Crittenden and stood by his confession in his testimony at the PCR hearing, thereby subjecting himself to a possible perjury prosecution. If Jackson was willing to give statements under oath accepting culpability for the sale to Crittenden, evidently knowing the penal

towards a defendant is of such importance to a defendant's fair trial rights that its improper exclusion has been held a denial of due process. *State v. Jamison*, 64 *N.J.* 363, 378, 316 *A.*2d 439 (1974) (citing *Chambers v. Mississippi*, 410 *U.S.* 284, 93 *S.Ct.* 1038, 35 *L.Ed.*2d 297 (1973)). In *Jamison, supra*, we expounded on the significance of a witness's confession exculpating a defendant and of the overarching need to place that evidence before the jury, even if it cannot be done through live testimony. *Id.* at 374, 316 *A.*2d 439. We recognized that although a confession read to a jury lacks the dramatic force of an in-person admission of guilt, it nevertheless would be essential to drive home that another person "had once admitted ... that he, not defendant, had" committed the crime. *Ibid.* It is difficult to understand why this basic principle was lost on defense counsel. The most likely explanation is that, due to his own lack of preparation, the compressed time in which he had to make decisions caused him to make grievous errors. In the end, the jury was deprived of highly probative evidence that exonerated Arthur.

## IV.

At trial, Arthur reaped the bitter harvest of his counsel's inadequate preparation. Despite the availability of four witnesses to buttress Arthur's case, defense counsel left the jury to judge a credibility contest between a convicted drug user and a police detective. It is hardly surprising that the jury believed the detective's version over Crittenden's uncorroborated testimony. Defense counsel conducted virtually no investigation. He spoke with no witness before the trial date with the possible exception of Crittenden. He did not subpoena key exculpatory witnesses. He

---

risks, I see no reason for the majority to speculate that he would not have testified similarly at defendant's trial had he been called to the stand.

The majority further speculates that Jackson's original courthouse confession to defense counsel might have been the product of pressure exerted by James Arthur. *Ante* at 327, 877 *A.*2d at 1195. There simply is not a shred of evidence in the record to support that supposition.

made Arthur shoulder the burden of producing witnesses, including Jackson, who faced incarceration if he testified favorably for the defense. Then, at the courthouse, defense counsel did not have Jackson sign a written confession or ensure that Jackson's admissions were made in the presence of a third person. Nor did he step down as counsel so that he could testify to Jackson's statements exonerating his client.

To say the least, it is highly unusual that three individuals would be willing to come forward and offer testimony not only exonerating a defendant, but also implicating another person in the neighborhood. It is still more unusual that the person implicated would actually admit his guilt to clear a wrongfully charged defendant. Those circumstances lend credibility to Arthur's claim that exculpatory witnesses vital to his defense were withheld from the jury.

Not even the distorting effect of hindsight can transform defense counsel's many serious omissions into reasonable strategic decisions. The only plausible explanation for counsel's keeping from the jury four witnesses who would have corroborated Crittenden's testimony was his grossly inadequate preparation. It is not enough even for experienced counsel to just show up for trial and make decisions on the fly. A minimum amount of investigation and preparation is required.

Counsel's defaults amounted to "errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. Arthur has shown that there is a reasonable probability that the outcome of his trial would have been different had his counsel engaged in reasonable preparation and presented the exculpatory witnesses at trial. I do not believe that Arthur received a fair trial or that we can regard the jury verdict as reliable. I also fear that the Court has set the constitutional bar for acceptable performance by criminal defense counsel at a dangerously low level. Because I would reverse the decision of the Appellate Division, I must dissent.

Justices ZAZZALI and WALLACE join in this dissent.

*For affirmance*—Chief Justice PORITZ, Justices LaVECCHIA and RIVERA–SOTO, and Judge SKILLMAN (t/a)—4.

*For reversal*—Justices ZAZZALI, ALBIN and WALLACE—3.