**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2888-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMES MESSINO,

     Defendant-Appellant.

_____

Argued December 17, 2018 – Decided January 16, 2019

Before Judges Gooden Brown and Rose.

On appeal from Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 99-02-0113.

Frank M. Gennaro, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Frank M. Gennaro, on the briefs).

Staci L. Scheetz, Senior Assistant Prosecutor, argued the cause for respondent (Charles A. Fiore, Gloucester County Prosecutor, attorney; Staci L. Scheetz, on the brief).

PER CURIAM

This matter returns to us after a remand to the Law Division for an evidentiary hearing on defendant James Messino's petition for post-conviction relief (PCR). State v. Messino, No. A-0535-08 (App. Div. Dec. 27, 2010) (slip op. at 2, 12) (initial PCR opinion).[1] On remand, another PCR judge conducted a multiple-day hearing, spanning one and-one-half years, and denied PCR in a thirty-six-page written opinion. On appeal, defendant renews his claims that his trial counsel provided ineffective representation by failing to: obtain necessary medical records and hire an expert in a timely manner; properly conduct an investigation; and present the testimony of necessary fact, expert and character witnesses. Defendant also claims counsel was ineffective by committing a "myriad" of cumulative errors. He urges us to conduct a de novo review of the record, contending the PCR judge's findings are not supported by the record. Having considered the record developed at the evidentiary hearing, we disagree and affirm.

I.

---

[1] Although citing an unpublished opinion is generally forbidden, we do so here to provide a full understanding of the issues presented and pursuant to the exception in Rule 1:36-3 that permits citation "to the extent required by res judicata, collateral estoppel, the single controversy doctrine or any other similar principle of law . . . ." See Badiali v. N.J. Mfrs. Ins. Grp., 429 N.J. Super. 121, 126 n.4 (App. Div. 2012), aff'd, 220 N.J. 544 (2015).

A-2888-16T4

A.

We incorporate by reference the facts and procedural history set forth at length in our initial PCR opinion, Messino, slip op. at 2-7, and in our reported opinion denying defendant's direct appeal. State v. Messino, 378 N.J. Super. 559, 568-74 (App. Div.), certif. denied, 185 N.J. 297 (2005). We summarize those facts that provide context to the present appeal.

On May 31, 1988, twenty-three-month-old D.R. died in bed in the home he shared with Laurie Roberts, D.R.'s mother and defendant's paramour. Two days before he died, D.R. underwent surgery to correct a congenital disorder, described as "an enlarged scrotum resulting from 'hydrocele' or fluid around the testicles." Id. at 569. While performing the procedure, D.R.'s surgeon observed that the child's "scrotum was slightly enlarged and bruised and the bruising extended to D.R.'s lower abdomen." Ibid. The surgeon also "observed blood in the tissues surrounding D.R.'s scrotum, which he had never seen when performing a hydrocele reduction procedure." Id. at 569-70. "D.R. also suffered from a genetic disorder called Hunter's Syndrome, a form of mucopolysaccharidosis (MPS), which is a condition that affects the joints and bones and makes movement of the arms difficult." Id. at 569.

A-2888-16T4

Early in the morning of his death, D.R. woke up suddenly. Roberts comforted D.R. and then handed him to defendant, who returned D.R. to his bed. In doing so, defendant dropped D.R. on a metal bed rail, but failed to inform Roberts, who was not in the room at that time. "Roberts and defendant went to bed, but shortly thereafter Roberts heard D.R. making a gagging sound. She went to the child and saw that his body was 'clenching and unclenching.'" Id. at 570. "Roberts thought that D.R. was having a seizure. Roberts and defendant called 911." Ibid. A paramedic and an emergency room doctor both testified that D.R.'s right flank and his testicles were very swollen. Id. at 570-71. D.R. died within hours of his admission to the hospital.

"[T]he autopsy revealed that the surgical incision that had been made in the hydrocele procedure was open and gaping." Id. at 571. The medical examiner testified at trial "that in his opinion the tear had been caused by a 'large blunt force,' such as from a forceful kick or punch, a car accident or a fall from ten or fifteen feet." Ibid. Observing that approximately one "quart of blood had collected in D.R.'s abdominal cavity[,]" the medical examiner determined the cause of D.R.'s death was "hypovolemic shock." Ibid. (internal quotation marks omitted). The medical examiner also testified that the bruise on D.R.'s abdomen "might be the result of child abuse and homicide." Ibid.

A-2888-16T4

"Evidence also was presented at trial concerning injuries that D.R. had sustained in the months preceding his death." Ibid. Those injuries included a spiral fracture in D.R.'s left tibia and a femur fracture. Id. at 571-72. An orthopedic surgeon, who treated D.R. three months before his death, opined that "two fractures in the same leg within a one-month period . . . is 'one of the hallmarks of child abuse.'" Id. at 572. Two other doctors, who also treated D.R. at that time, agreed there was no causal relationship between MPS and bone fractures. Ibid. Another surgeon who also "treated D.R. in February 1998 for the multiple fractures . . . testified that D.R. had normal bone density and his bones were not especially brittle." Ibid. According to that surgeon's observations, "there was no doubt that D.R. had been physically abused." Ibid.

Defendant failed to inform the paramedics or hospital staff that he had dropped D.R. on the metal rail. During his interviews with police, defendant eventually admitted he dropped D.R., who fell "about one or one-and-a-half feet[,]" striking his upper chest against the bed railing. Id. at 573. Thereafter, defendant and Roberts[2] were indicted for knowing or purposeful first-degree

---

[2] Prior to defendant's trial, Roberts pled guilty to obstruction of justice, N.J.S.A. 2C:29-1, with a probationary recommendation by the State, in exchange for her cooperation against defendant.

A-2888-16T4

murder, N.J.S.A. 2C:11-3(a)(1) or (2), and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2).

Although defendant did not testify at trial, two expert witnesses testified on his behalf: Dr. Roger A. Berg, a radiologist; and Dr. John E. Adams, a forensic pathologist. Id. at 574. Dr. Berg "opined that the x-rays taken of D.R.'s tibia fracture indicated that it was a 'toddler's fracture' which is common in children learning to walk[, and] . . . the femur fracture could have been caused by a fall." Ibid. Among other things, Dr. Adams testified that

> D.R.'s abdominal injury was not consistent with a fist blow. He asserted that D.R. had some sort of blood clotting problem but he did not know its cause. He also stated that D.R.'s abdominal bruise could have been the result of striking the right flank against the rail of the bed when he fell from defendant's hands. Adams said that the patterns in the bruise were not the sort of patterns that could have resulted from a bare fist.
>
> [Ibid.]

Following a jury trial, defendant was convicted of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), a lesser-included offense of murder, and second-degree endangering the welfare of a child. He was sentenced to an aggregate twenty-nine-year term of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2(d)(2) and (20).

Although the PCR court initially denied defendant's petition without an evidentiary hearing, we directed the court to conduct such a hearing on remand. We framed the issues raised by defendant as follows:

> Unquestionably, the medical issues in the case were complex. The expert reports defendant submitted in support of his petition contain opinions confirming the opinion of Dr. Adams that D[.R.]'s pre-existing MPS complicated "by failure of the child's clotting mechanism, [were] absolutely unique[.]" Under these circumstances, testimony from additional experts cannot be viewed as cumulative for purposes of determining whether, if called, their testimony would have altered the jury verdict. Given the inference of abuse that could be drawn from [the] testimony [of Roberts' aunt] that D[.R.] started to sustain injuries after defendant and Roberts started dating, testimony from character witnesses and additional experts, as well as from the [Division of Youth and Family Services (DYFS)[3]] workers who conducted an investigation into suspected abuse, <u>may have altered the jury's verdict.</u>
>
> Defendant was indicted for knowing or purposeful murder but found guilty of aggravated manslaughter, "recklessly caus[ing] death under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4. In his statement to police, he claimed that D[.R.]'s death was an accident. If trial counsel and his firm were provided with sufficient funds, as defendant alleges, to mount a comprehensive investigation, particularly with respect to the medical issues that were unquestionably critical to defendant's defense, and trial counsel inexplicably failed to do so, ineffective assistance of counsel may be

---

[3] DYFS is now known as the Division of Child Protection and Permanency.

established. On the other hand, it may very well be that these and other options were properly considered, investigated and ultimately rejected by trial counsel for perfectly valid reasons, including strategic reasons, in which case defendant is not entitled to relief. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a claim for [PCR] based upon ineffective assistance of counsel. State v. Cooper, 410 N.J. Super. 43, 57 (App. Div. 2009) (quoting Strickland [v. Washington], 466 U.S. [668,] 690-91 [(1984)]).

We are satisfied, however, that the proofs presented in support of the petition represent more than bald assertions. Defendant's allegations were supported by affidavits based upon the personal knowledge of the affiants, expert reports and DYFS records. If believed, a jury may have reasonably concluded that D[.R.]'s death was accidental rather than as a result of reckless indifference to the value of human life for which defendant was convicted.

[Messino, slip op. at 10-12 (emphasis added).]

We therefore found defendant had established a prima facie claim of ineffective assistance of counsel, and an evidentiary hearing was necessary "to further flesh out his claims." Id. at 13.

B.

On numerous dates between December 9, 2014 and June 24, 2016, Judge Robert P. Becker, Jr. conducted an evidentiary hearing during which defendant testified and presented the testimony of more than twenty witnesses: Dr. Phillip

8

Ginsberg, a urology expert; Dr. Robert Stratton, a child abuse expert; Alexander Esposito, a private investigator and Dr. Claus Speth, a forensic consultant, who were retained by his trial counsel to assist in preparation of defendant's trial; a registered nurse and a nursing consultant who assisted DYFS in its evaluation of D.R.'s home prior to his death; and fourteen of the more than thirty witnesses defendant claimed in his PCR petition would have testified as character witnesses at trial. Included among those witnesses were defendant's mother, brother, aunt, co-workers, and friends. Defendant's trial counsel, Jaime Kaigh, testified on behalf of the State over the course of five days.

Notably, Kaigh explained that after obtaining defendant's file, he reviewed all discovery including recorded statements, transcripts, diagrams, hospital records, police reports, and lists of potential witnesses. Kaigh obtained voluminous out-of-state medical records detailing D.R.'s medical history. Kaigh summarized the defense theory of the case as follows:

> [D.R.] suffered from MPS. There were allegations of child abuse that had to be addressed in conjunction with the allegation of murder and homicide. The child was reported to have scratched corneas. Cloudy corneas are part of MPS.
>
> The child was reported to have hair pulled out, when in reality it was alopecia. A disease causing the hair loss.

. . . .

The child was reported to have had multiple leg fractures, yet, they can be explained as toddler fractures. The second fracture coming when he was wearing a cast.

So, all the allegations of child abuse could be explained medically, either through the walking cast that he had, the toddler fractures, the alopecia, the self-abusive behavior of MPS.

So . . . my theory of the case was consistent with [defendant's] last statement to the police, he accidentally dropped this child. . . . he was in no way a child abuser, all the abuse can be explained; and that not every accident is reckless.

Certainly, the goal of this case was to get away from knowing or purposeful conduct . . . murder. <u>So, when faced with a confession, that, [defendant] accidentally dropped the child, the only theory of this case . . . borne out through cross-examination of all the doctors, was that this was an accidental death.</u>  And, the main contributor was the MPS.  Which also explained away many of the allegations of child abuse.

[(Emphasis added)].

From the inception of his representation, Kaigh endeavored to find medical experts, hiring Esposito to assist him.  They first hired Speth as a medical consultant, who opined that D.R.'s death was related to his MPS and "the bed that [D.R.] slept in could have caused the injury if . . . defendant

dropped the child as he described in his second taped statement." Because he had a criminal conviction, Speth did not testify at trial.

Kaigh also hired Dr. John Smialek, a forensic pathologist. However, Dr. Smialek withdrew his assistance because he disagreed with Speth's theory of the case. Dr. Smialek died sometime after withdrawing from the case.

Thereafter, Kaigh attempted to retain Dr. Michael Baden, whom Kaigh described as "probably the most revered pathologist in the country." However, Dr. Baden was unable to author a report that was beneficial to the defense because he believed defendant dropped D.R. and that such conduct was evidence of manslaughter or aggravated manslaughter.

After Dr. Baden withdrew from the defense team, Dr. Adams, who had written a report on behalf of Roberts, agreed with Speth's theory and agreed to author a report supporting that viewpoint. Apparently, Dr. Adams's report was not furnished to the State until just prior to trial. Kaigh acknowledged that the lateness of Adams's report and the previous report he had authored on behalf of Roberts opining that D.R.'s injuries were not caused by accidental means, likely were not viewed favorably by the jury. Nonetheless, Kaigh thought Adams was a qualified forensic pathologist, a good witness, and someone who could convince a jury of his point of view.

Kaigh also addressed other aspects of his trial strategy. For example, he discussed his exhaustive search to locate an expert in Hurler-Scheie Syndrome, the specific type of MPS that afflicted D.R., and his decision to refrain from pursuing additional test results, which had been sent to Australia concerning D.R.'s corneal injuries, concluding they were not pertinent to the specific type of MPS at issue in the case. Further, Kaigh reviewed the DYFS records and determined that they did not pertain to an investigation of defendant, but rather to the caretaking of D.R. Kaigh also determined it was unnecessary for Esposito to conduct interviews of the State's witnesses. Specifically, Roberts had informed Kaigh "repeatedly that all of her family members didn't like [defendant], and that [D.R.] . . . would cry out when [defendant] came near [him]."

In discussing his reasons for refraining from calling character witnesses, Kaigh emphasized that since defendant previously lied to first responders and the police, Kaigh believed it would be "extremely self-defeating when a person has lied" to place before the jury defendant's character for honesty through his family and friends. According to Kaigh, "[m]ost lay people who make up [a] jury are going to say, [']a mother would say anything for her child, whether it's true or not[.']" During the evidentiary hearing, defendant's proposed character

witnesses gave contradictory or non-responsive answers to the State's question whether their opinion for truthfulness would "change if [they] knew [d]efendant lied to the police about what happened in this case[.]"

Among the other witnesses who testified at the hearing, Dr. Ginsberg opined that he reviewed D.R.'s hemoglobin tests, which indicated to him that the child was bleeding before he arrived at the hospital for his hydrocele surgery. However, Dr. Ginsberg acknowledged that the swelling to D.R.'s testicle could have been caused by trauma. He conceded that in his twenty-five years of practice he had never treated a patient with MPS.

On June 24, 2016, Judge Becker issued a comprehensive written opinion concluding defendant's claims lacked merit. Notably, the judge found "Kaigh to be credible in every respect during his testimony." The judge elaborated:

> The [c]ourt finds that [d]efendant's assertion that trial counsel was constitutionally ineffective for not calling an expert witness specializing in MPS, as well as other potential expert witnesses, does not satisfy the Strickland/Fritz[4] threshold. The [c]ourt finds that trial counsel, Mr. Kaigh, is credible and exhausted all possibilities with respect to researching, contacting, and pursuing all potential expert witnesses for trial. The [c]ourt is satisfied that Mr. Kaigh's conduct [was] illustrative of zealous advocacy, not ineffective representation that would entitle [d]efendant to relief.

---

[4] Strickland, 466 U.S. at 687-88; State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland two-part test in New Jersey).

A-2888-16T4

This is especially true when considering that matters of strategy are given a level of deference.

Judge Becker also found that trial counsel conducted a reasonable investigation into the allegations of child abuse. Similarly, he found Kaigh's decision not to present character witnesses to be a reasonable trial strategy intended to avoid highlighting defendant's initial lies. Specifically:

> Defendant basically acknowledged that some form of mishap occurred which caused the child to have the resultant injuries. This admission came after initial denials of the child having been subject[ed] to a mishap such as dropping, throwing or striking. One can say that . . . [d]efendant accepted the victim with the conditions the child had on the day of the incident or mishap. . . . Defendant was not subsequently convicted of [p]urpose[ful] or [k]nowing [m]urder, but of a lesser[-]included offense of [a]ggravated [m]anslaughter, along with a separate charge of [e]ndangering the [w]elfare of a [c]hild. This verdict points to the fact that Mr. Kaigh's representation was in fact effective. It could be reasonably concluded that the jury verdict was based upon . . . [d]efendant's actions with [a] child who was in a precarious situation health[-]wise and that the subsequent admission by . . . [d]efendant regarding the mishap was enough to constitute [aggravated m]anslaughter. If . . . [d]efendant had acted to assist the child immediately, the result may have been different.

Finally, Judge Becker concluded defendant failed to demonstrate a reasonable probability that trial counsel's deficiencies prejudiced defendant. Conversely, Kaigh was successful in his representation of defendant because the

14

jury found defendant guilty of the lesser-included aggravated manslaughter charge, rather than knowing or purposeful murder. Accordingly, Judge Becker denied defendant's petition for post-conviction relief. This appeal followed.

## II.

Our review of a PCR claim after a court has held an evidentiary hearing "is necessarily deferential to [the] PCR court's factual findings based on its review of live witness testimony." State v. Nash, 212 N.J. 518, 540 (2013); see also State v. O'Donnell, 435 N.J. Super. 351, 373 (App. Div. 2014) ("If a court has conducted an evidentiary hearing on a petition for PCR, we necessarily defer to the trial court's factual findings."). Where an evidentiary hearing has been held, we should not disturb "the PCR court's findings that are supported by sufficient credible evidence in the record." State v. Pierre, 223 N.J. 560, 576 (2015) (internal quotation marks omitted) (quoting Nash, 212 N.J. at 540). We review any legal conclusions of the trial court de novo. Nash, 212 N.J. at 540-41; State v. Harris, 181 N.J. 391, 419 (2004).

"[A] defendant asserting ineffective assistance of counsel on PCR bears the burden of proving his or her right to relief by a preponderance of the evidence." State v. Gaitan, 209 N.J. 339, 350 (2012). A defendant must prove counsel's performance was deficient; it must be demonstrated that counsel's

handling of the matter "fell below an objective standard of reasonableness" and that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687-88; State v. Fritz, 105 N.J. 42, 52 (1987).

A defendant must also prove counsel's "deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. Prejudice is established by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Thus, petitioner must establish that counsel's performance was deficient and petitioner suffered prejudice in order to obtain a reversal of the challenged conviction. Id. at 687; Fritz, 105 N.J. at 52.

We have duly considered defendant's contentions before us in light of the record, the applicable law, and the trial court's credibility findings. Having done so, we affirm the denial of defendant's PCR petition, substantially for the sound reasons expressed in Judge Becker's post-hearing written decision. Only a few comments are warranted.

The judge discussed Kaigh's decision to refrain from presenting the testimony of Dr. Baden and defendant's family members, friends and co-workers against the backdrop of the case law which recognizes that the decision as to

which witnesses to call is "one of the most difficult strategic decisions that any trial attorney must confront." State v. Arthur, 184 N.J. 307, 320 (2005). The decision is generally informed by the testimony expected to be elicited, the possibility of impeachment, both by prior inconsistencies or conflicting testimony by other witnesses, and the witness's general credibility. Id. at 320-21. "Therefore, like other aspects of trial representation, a defense attorney's decision concerning which witnesses to call to the stand is 'an art,' and a court's review of such a decision should be 'highly deferential.'" Ibid. (citation omitted).

In sum, the evidentiary hearing that defendant sought and received provides no basis to set aside his conviction and sentence. We are satisfied the options delineated in our initial PCR opinion "were properly considered, investigated, and ultimately rejected by trial counsel for perfectly valid reasons, including strategic reasons . . . ." Messino, slip op. at 12. We accept Judge Becker's well-reasoned determination that defendant failed to prove either prong of the Strickland standard. We therefore see no reason to disturb the judge's factual and credibility findings. Those findings are fully supported by the record and are entitled to our deference. State v. Robinson, 200 N.J. 1, 15 (2009).

A-2888-16T4

To the extent we have not addressed defendant's remaining claims, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2888-16T4