# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3853-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHAEL CAWLEY,

     Defendant-Appellant.

_____

Submitted May 3, 2021 – Decided August 23, 2021

Before Judges Messano and Hoffman.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 08-12-2127.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel; Catherine A. Foddai, Legal Assistant, on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Michael Cawley appeals from a December 12, 2019 Law Division order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm.

I.

We glean the following facts from our prior opinion on defendant's direct appeal, State v. Cawley, No. A-0382-12 (App. Div. April 7, 2015) (slip op. 2-8),[1] and from the record.

On August 20, 2005, M.L. ("Maria") met with D.L. ("Dawn"), G.F. ("Gia"), N.M. ("Noelle"), S.K. ("Sue"), and another friend for a bachelorette party celebrating the upcoming wedding of Dawn and Maria's brother. After a night of heavy drinking in Manhattan, the group returned to Hoboken by train, at approximately 3 a.m. Maria was extremely intoxicated, such that she was almost incoherent and passed out on the train.

Upon returning to New Jersey, the group split up into two cabs. Maria, Noelle, and Gia shared a cab, intending to go to Noelle's apartment. Maria and Gia became sick during the trip, and their cab dropped them off on a street corner

---

[1] For ease of reference, and to protect the privacy of the victim, we use the same initials and pseudonyms used in our prior opinion. See Rule 1:38-3(c)(12).

a short distance from the apartment. Maria and Gia fell to the sidewalk and refused to follow Noelle. Noelle left to get them some water from her apartment, and, on her way back, met Gia at the entrance to her building. Noelle returned to the street corner and found that Maria had disappeared. Noelle estimated that only five to seven minutes had elapsed since she left Maria.

Having reconnected with the friends in the other cab, the group searched the area for over an hour. Calls to Maria's cell phone went directly to her voicemail. Eventually, the group returned to Noelle's apartment, called Maria's brother, and fell asleep.

Maria could not remember how she left the street corner and did not know whether she had been abducted or left voluntarily. Her memories of that morning began with her standing in a strange house with two male strangers. She was naked but for a tank top and gripped her cellphone tightly in her left hand. She testified that the men forcefully pulled her out of the house and into the back door of a blue Eddie Bauer model Ford Expedition, which she recognized because her mother owned the same model with similar trim. One of the men entered the backseat and commanded Maria remove her tank top. The other man got in the driver's seat and drove the car away from the house.

A-3853-19

While driving around, the man in the backseat raped Maria two times. When she tried to look outside of the car to see where they were, he became angry and choked her. When she tried to use her cell phone, he took it and tossed it aside. Reaching to retrieve her cell phone, Maria discovered her bra near the front seat.

The two men began to converse in Spanish, which Maria did not understand. Eventually, Maria heard one of them say "let's get rid of her[,]" which Maria believed to mean they were going to kill her. After traveling a little while longer, the car came to a stop, and the man in the backseat shoved Maria out onto the pavement.

By that point, the sun had risen, and Maria observed railroad tracks, industrial buildings, and an apartment complex. Unable to rouse anyone at the apartment complex, she dropped to the ground at a street corner, and curled up in a fetal position. Eventually, a delivery man noticed Maria laying on the street corner and summoned the police.

Video surveillance from the apartment complex showed a blue Ford Expedition traveling in one direction at approximately 6:40 a.m., and then returning in the other direction about one minute later but did not reveal the car's

A-3853-19

license plate number. A few moments later, the recording showed Maria, clothed in only a bra, running through the complex's parking lot.

Maria was transported to a hospital, where, beginning at approximately 8:20 a.m. on August 21, 2005, she gave two statements, one to Detective Ronnie Petzinger, and one to Beryl Skog, a sexual assault nurse examiner. During both statements, Maria appeared fearful and extremely upset, and cried uncontrollably at times.

Nurse Skog then performed a forensic sexual assault medical examination at 8:50 a.m. and retrieved samples of semen. Testing also showed that Maria had a blood-alcohol reading of .105, and her urine tested positive for Vicodin, which was consistent with a prescription she had received following surgery earlier that week.

The police investigation stalled for more than one year until, in 2007, officials from the Jersey City Fire Department discovered Maria's driver's license in the center console of Bryon Chica's car while investigating a possible arson. Records indicated that Chica had owned a Ford Expedition in August 2005. Police interviewed Chica, and took a buccal swab, but his DNA was not a match for the samples recovered from Maria.

A-3853-19

The police then showed a sketch of Maria's assailant to Chica's ex-wife, who directed the officers to defendant. Motor vehicle records showed that defendant had also owned a blue Ford Expedition in August 2005.

On April 18, 2007, police interviewed defendant. After detectives read defendant his Miranda[2] rights, he waived his right to an attorney. Approximately twenty-five minutes into the interview, detectives asked whether defendant would provide a DNA sample. Defendant replied, "[A]t this point, I think I want a lawyer." Nevertheless, the detectives continued with the interview, repeatedly requesting a DNA sample, while defendant continued to ask for an attorney. Eventually, defendant relented and agreed to provide a buccal swab. Subsequent analysis showed that defendant's DNA matched the semen obtained from Maria.

The police next obtained defendant's E-ZPass records, which showed that defendant had three E-ZPass transponders on his account, and that one of the vehicles registered to use the transponders was a Ford Expedition. One of the transponders exited the turnpike at 6:33 a.m. on August 21, 2005, at a toll booth about one and one-third miles from the spot where Maria was thrown from the car. Then, at 6:46 a.m., the same transponder entered the same toll booth

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3853-19

traveling in the opposite direction. Police also determined that defendant had traded in his Ford Expedition on August 22, 2005, one day after the crimes under investigation.

On December 16, 2008, a Bergen County grand jury returned an indictment charging defendant and Chica with first-degree kidnapping, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:13-1(b) (count one); first-degree aggravated sexual assault during a kidnapping, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:14-2(a)(3) (count two); first-degree aggravated sexual assault by physical force or coercion, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:14-2(a)(5) (count three); first-degree aggravated sexual assault upon a helpless victim, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:14-2(a)(7) (count four); third-degree theft, N.J.S.A. 2C:2-6 and N.J.S.A. 20-3(a) (count five); second-degree conspiracy to commit kidnapping, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:13-1(b) (count six); and second-degree conspiracy to commit aggravated assault, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:14-2(a) (count seven). The indictment also charged defendant alone with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (count eight).

In September 2011, the trial court conducted a multi-day hearing on the admissibility of defendant's statement and the DNA results obtained from the buccal swab he provided. In an opinion and order filed on October 21, 2011,

the motion judge suppressed that portion of defendant's statement after he requested counsel; however, the judge concluded that DNA results were admissible under the inevitable discovery doctrine.

Defendant and Chica were tried together before a jury in early 2012. Maria, Noelle, Dawn testified, as did various law enforcement and other witnesses, who provided the details of the investigation that led to defendant.

Defendant testified. According to his testimony, he lived with Chica and one other roommate in August 2005. Defendant owned three vehicles, including a blue Eddie Bauer model Ford Expedition. He had three E-ZPass transponders, which he kept in a bowl at the house for Chica and another roommate to use as needed.

Defendant further testified that on August 20, 2005, he, Chica, and their roommate went out to a nightclub in Hoboken, traveling in Chica's Expedition. While outside talking, they saw Maria walking down the block, and struck up a conversation with her. According to defendant, Maria "was not drunk at all," and voluntarily returned to defendant's house, where they had consensual sex. Defendant said that when he awoke at about 10 a.m., Maria was gone. He claimed that Chica later told him that Maria had wanted to go home, so Chica and the roommate took her back to Hoboken.

8

At the conclusion of the fifteen-day trial, the jury found defendant guilty on counts one, two, three, four, five, and eight. The jury acquitted Chica on all counts and in turn, acquitted defendant on the two conspiracy counts, counts six and seven.

On July 26, 2012, the trial court sentenced defendant to consecutive prison sentences of thirty years on count one, twenty years on count four, and ten years on count eight, all subject to NERA parole disqualifiers for an aggregate sentence of sixty years of incarceration with fifty-one years of parole ineligibility.[3] Defendant appealed, and on April 7, 2015, we affirmed defendant's conviction but remanded for resentencing. See Cawley, slip op. at 21-23.

On October 5, 2015, our Supreme Court granted defendant's petition for certification, "limited to the issues of whether the DNA evidence was properly admitted under the inevitable discovery doctrine and whether it was permissible for the prosecutor to use for impeachment purposes defendant's prior statements that were secured in violation of defendant's constitutional rights." State v. Cawley, 223 N.J. 278 (2015); however, exactly one year later, on October 5,

---

[3] The trial court imposed a prison sentence of twenty years on count two, twenty years on count three, and five years on count five, all to run concurrently to the other sentences.

A-3853-19

2016, the Court dismissed defendant's appeal, "having determined that certification was improvidently granted." State v. Cawley, 228 N.J. 21 (2016).

On March 9, 2017, defendant was resentenced to the aggregate sixty-year term, subject to fifty-one years of NERA parole ineligibility.

Defendant filed a pro se petition for PCR on June 29, 2017, listing twenty grounds for relief. He submitted certifications dated March 28, 2018 (first PCR certification) and November 7, 2018 (second PCR certification) in support of his petition. On July 17, 2019, with the help of counsel, defendant submitted an amended pro se petition, stating grounds of ineffective counsel and prosecutorial misconduct. The PCR judge heard oral argument on defendant's PCR petition on December 6, 2019.

On December 12, 2019, the PCR judge denied defendant's petition for PCR and declined to grant an evidentiary hearing on any of defendant's claims. The judge issued an accompanying written opinion on that date in support of her order.

This appeal followed, with defendant's counsel raising the following arguments:

> POINT I – THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT

ESTABLISHED A PRIMA FACIE CASE
OF COUNSELS' INEFFECTIVENESS.

A. Trial Counsel Misinformed Defendant As To The Maximum Penal Consequences If He Proceeded To Trial.

B. Trial Counsel Failed To Pursue A Third-Party Guilt Defense.

C. Trial Counsel Failed To Investigate Potential Exculpatory Witnesses And/Or M.L.'s History.

D. Trial And Appellate Counsel Failed To Object To The Ambiguous "And/Or" Kidnapping Charge.

E. Trial Counsel Failed To Prepare Defendant To Testify.

POINT II – THIS MATTER MUST BE REMANDED FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE CLAIMS NOT ADDRESSED BY THE PCR COURT.

Additionally, defendant filed a pro se supplemental brief in which he argues:

I. DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

II. SENTENCING INEFFECTIVENESS OF TRIAL COUNSEL, ALLOWED AN ILLEGAL SENTENCE BE IMPOSED BY THE TRIAL COURT REQUIRES THE CONVICTION BE OVERTURNED.

III.    APPELLATE COUNSEL WAS INEFFECTIVE BY FAILING TO RAISE COGNIZABLE CLAIMS OF TRIAL ERRORS.

IV.    THE BERGEN COUNTY ASSISTANT PROSECUTORS DURING TRIAL ARE LIABLE FOR PROSECUTORIAL MISCONDUCT CAUSING BOTH A FUNDAMENTAL MISCARRIAGE OF JUSTICE AND A <u>WRONGFUL CONVICTION</u> WHICH REQUIRES TO BE VACATED AND DEFENDANT ACQUITTED DUE TO ACTUAL INNOCENCE.

V.    A COURT REVIEWING A CLAIM OF ACTUAL INNOCENCE PROPERLY CONSIDERS THE ENTIRE RECORD AS A WHOLE . . . WHICH ESTAB[L]ISHES THAT MR. CAWLEY, HAS BEEN WRONGFULLY CONVICTED . . . BECAUSE HE IS ACTUAL[L]Y INNOCENT . . . THE COURT MUST "OVERTURN []THE CONVICTION," . . . AND REVERSE, DIRECTING A NEW ENTRY OF JUDGMENT OF ACQUITTAL.

VI.    THE MANNER IN WHICH PHYSICAL HELPLESSNESS WAS PRESENTED TO THE JURY IN THE INSTRUCTION, DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL. ACCORDINGLY THE TRIAL COURT TESTIMONY OF RECORD PROVIDES REBUT[T]AL EVIDENCE THAT M.L. WAS NOT PHYSICALLY HELPLESS.

II.

To succeed on a petition for PCR, a defendant "must establish the right to such relief by a preponderance of the credible evidence." State v. Preciose, 129 N.J. 451, 459 (1992). Grounds for PCR include the "[s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey . . . ." R. 3:22-2. Both the United States and New Jersey constitutions guarantee "the right to effective assistance of counsel[,]" and thus, the denial of that right may entitle a defendant to PCR. State v. Nash, 212 N.J. 518, 541-42 (2013) (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)).

The standard for determining whether counsel's performance was constitutionally ineffective was formulated in Strickland, 466 U.S. at 687, and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42 (1987). In order to prevail on an ineffective assistance of counsel claim, defendant must meet a two-prong test by establishing that: (l) counsel's performance was deficient and he or she made errors that were so egregious that counsel was not functioning effectively as guaranteed by the Sixth Amendment to the United States Constitution; and (2) the defect in performance prejudiced defendant's rights to a fair trial such that there exists "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."
Strickland, 466 U.S. at 687, 694.

Defendant is entitled to an evidentiary hearing on a PCR petition if he or she establishes a prima facie case in support of PCR.  R. 3:22-10.  To establish a prima facie case of ineffective assistance of counsel, a defendant must demonstrate a "reasonable likelihood of succeeding under the test set forth in Strickland . . . ."  Preciose, 129 N.J. at 463.

Defendant asserts his PCR petition established a prima facie claim of ineffective assistance of counsel, and thus the PCR court erred by declining to grant an evidentiary hearing.  In his PCR petition, defendant alleged his trial counsel's representation was deficient in a variety of ways.  Below, we address the arguments in defendant's petition re-raised on appeal, employing a de novo standard of review.  State v. O'Donnell, 435 N.J. Super. 351, 373 (App. Div. 2014) (quoting State v. Harris, 181 N.J. 391, 421 (2004)) ("[I]t it is within our authority 'to conduct a de novo review of both the factual findings and legal conclusions of the PCR court.'").

A.

Defendant first contends his trial counsel's representation was deficient and prejudicial because she failed to inform defendant of his maximum exposure

on the charges before trial, which influenced defendant's decision to reject a plea offer that recommended a mere ten-year sentence. In his second PCR certification, defendant alleged:

> Sometime in May 2010, trial counsel presented me an offer from the State which recommended a sentence of [ten] years in prison with an 85% period of parole ineligibility in exchange for a guilty plea. I reviewed the offer with my attorney. My attorney, however, assured me the kidnapping charge would fail at trial and that I faced a maximum of twenty-years imprisonment but would likely receive significantly less given my lack of a prior criminal history. At no point did my attorney advise me that I faced a sixty-year sentence should I be convicted if I proceeded to trial. Nor did trial counsel inform me that I faced the risk of consecutive sentences. Based upon trial counsel's misrepresentation, I rejected the plea offer and proceeded to trial.

Correspondingly, defendant's amended PCR petition provided, "Trial counsel was ineffective [because] she misinformed defendant [about] his sentencing exposure. . . . Had he known he would have been subject to [sixty] years he would have agreed to plea offer of [ten] years . . . . "

Even if we assume trial counsel did misinform defendant of his maximum exposure, defendant cannot establish this error prejudiced him under the second Strickland prong. Consequently, this claim fails to set forth a prima facie case of ineffective counsel. In State v. Taccetta, 200 N.J. 183, 197-98 (2009), our

15

Supreme Court held that a defendant who asserts his innocence cannot claim he suffered prejudice from his trial attorney's deficient advice that caused him to reject a favorable plea offer. The Court reasoned, because in New Jersey, "a trial court cannot accept a guilty plea that is known to be false" as doing would amount to "[c]ourt-sanctioned perjury[,]" it is improper "for a PCR court to vacate a jury verdict following a fair trial on the ground that defendant would have taken an advantageous plea offer with a limited sentence exposure if only he had been given the opportunity to lie under oath." Id. at 195, 197.

Under oath at trial and in his PCR petition, defendant denied committing all the charged crimes. It follows that defendant could not have entered a plea of guilty to any of the charges without committing perjury. Because the trial court would not have accepted a perjured plea, any misadvice from trial counsel regarding potential exposure does not equate to prejudice here. Absent a showing of prejudice on this claim, defendant failed to set forth a prima facie case and was not entitled to an evidentiary hearing.

## B.

Next, defendant alleges trial counsel was ineffective by failing to investigate, interview, and call certain witnesses. He argues trial counsel inexplicably ignored his requests to pursue these witnesses, which prejudiced

16

him at trial because they would have corroborated defendant's testimony and/or established a third-party guilt defense.

"Determining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront." State v. Arthur, 184 N.J. 307, 320 (2005). "[L]ike other aspects of trial representation defense attorney's decision concerning which witnesses to call to the stand is 'an art,' and a court's review of such a decision should be 'highly deferential . . . .'" Id. at 321 (quoting Strickland, 466 U.S. at 693, 689) (internal citations omitted).

Still, despite the deference accorded to trial counsel's strategic decisions, an ineffective assistance of counsel claim may occur when counsel fails to conduct an adequate pre-trial investigation. State v. Porter, 216 N.J. 343, 352-53 (2013). Our Supreme Court has stated:

> If counsel thoroughly investigates law and facts, considering all possible options, his or her trial strategy is virtually unchallengeable. But strategy decisions made after less than complete investigation are subject to closer scrutiny. Indeed, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. A failure to do so will render the lawyer's performance deficient.
>
> [State v. Savage, 120 N.J. 594, 617-18 (1990) (citations and quotation marks omitted).]

In such cases where a defendant claims his attorney failed to adequately investigate the case, "he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification."  Porter, 216 N.J. at 355 (quoting State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999)).

In his first and second PCR certifications, defendant identified ten witnesses allegedly overlooked by trial counsel:  Wilfred Perez, Louis Danny Geacoman,[4] Jamilla Aziz, Mike Mansel, Bob Williams, Jessica Larrea, Cora Taylor, Maria's brother, Gia, and Sue.  Defendant provided, in varying detail, the import of these potential witnesses.

According to the defendant, Geacoman and Perez had significant knowledge of or were involved in Maria's assault. Perez specifically was Chica's cousin who was in defendant's apartment on the night of the assault.  Aziz was Chica's wife who would have corroborated that Chica was staying at defendant's apartment on the night of the assault.  She also initially identified Chica as the suspect depicted in the composite sketch but later changed her mind and decided

---

[4]  As defendant points in his brief, Geacoman's name is spelled inconsistently throughout the record.  We opt for the spelling used by defendant in his brief.

A-3853-19

it looked like defendant.[5] Mansel was a police officer who elicited a statement from Chica where he recounted meeting Maria and driving her home. Williams worked with Chica and would have testified that Chica bragged about having sex with Maria. Larrea was defendant's girlfriend when the incident took place who would have corroborated that defendant's guests had access to his multiple E-ZPass transponders and that Chica lived with defendant then. Gia, Sue, and Maria's brother would have confirmed Maria was not intoxicated on the night of the incident.

Despite defendant's contention that trial counsel ignored his request to investigate these witnesses, during defendant's trial, trial counsel stated on the record, "[defendant] gave me the name of potential witnesses. My investigator interviewed them, and I have determined, as trial strategy, not to use them." She later added, "My investigator did speak to all of them."

Because defendant insisted his requested witnesses be called, trial counsel reiterated her trial strategy entailed not calling the witnesses "because they will not add anything to or are unavailable." Specifically, trial counsel explained Aziz did not want to testify and that her testimony would not be helpful to

---

[5] Defendant's PCR petition names Taylor but does not explain why trial counsel should have investigated her. However, the trial transcript reveals Taylor was the detective who showed Aziz the composite sketch.

A-3853-19

defendant because she identified defendant from the composite sketch. Testimony from Taylor, who showed Aziz the composite, would likewise be unhelpful. Geacoman had been deported and was thus unavailable. And Bob Williams had sustained a head injury and did not remember defendant or the other parties. Neither trial counsel nor defendant mentioned any other witnesses.

The record does not support defendant's claim that trial counsel inadequately investigated the potential witnesses. Trial counsel explicitly stated on the record that her investigator interviewed all witnesses identified by defendant. Her decision, as a matter of trial strategy, not to call these witnesses was thus informed by adequate investigation. Our Supreme Court has recognized that "[d]etermining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront[,]" Arthur, 184 N.J. at 320, and that decision is assessed by the court in the context of the State's case against defendant and the strengths and weaknesses of the evidence available to the defense. State v. Pierre, 223 N.J. 560, 579 (2015).

Regardless, even if trial counsel failed to investigate one, some, or all of the six other witnesses identified by defendant in his PCR petition but not mentioned by trial counsel or defendant at trial, we find no evidence that these

witnesses would have materially strengthened defendant's case. The testimony that defendant claims these witnesses would have offered would have done little to minimize the overwhelming evidence against defendant, which included defendant's semen obtained from the victim, defendant's admission that he had sex with the victim, and defendant's car and E-ZPass transponder being linked to the time and location where Maria was dumped after her assault. Defendant's claim of inadequate investigation therefore cannot establish prejudice under the second Strickland prong.

Relatedly, defendant also claimed trial counsel's pretrial investigation was deficient because she failed to investigate Maria's substance use history and possible amnesia. This claim is baseless because these issues were explored during Maria's trial testimony, and in any event, defendant fails to demonstrate that more thorough investigation into these claims would have affected the outcome of his trial.

Defendant's claims concerning the adequacy of trial counsel's pretrial investigation do not establish a prima facie case of ineffective assistance of counsel. Therefore, no evidentiary hearing was required to explore this issue.

21

C.

Defendant next argues his trial counsel was ineffective by failing to object to the jury instructions on kidnapping, and likewise appellate counsel was ineffective for failing to challenge the instructions on defendant's direct appeal. Relying on State v. Gonzalez, 444 N.J. Super. 62 (App. Div. 2016), defendant contends the jury instructions were ambiguous and erroneous because of their use of "and/or."

Gonzalez involved a defendant who accompanied two co-defendants as they robbed and shot a drug dealer. Id. at 66-67. The issue was whether the defendant shared the co-defendants' intent to commit the crimes or whether his participation was the product of duress. On appeal, we found error in the trial court's jury charge on conspiracy and accomplice liability because the charge referred to "robbery 'and/or' aggravated assault" when referring to the substantive crimes the co-defendants were alleged to have committed for which the defendant was to be considered accountable. Id. at 73-75. We explained the critical flaw in the charge as follows:

> [T]he nature of the indictment required that the jury decide whether defendant conspired in or was an accomplice in the commission of a robbery, or an aggravated assault, or both. By joining (or disjoining) those considerations with "and/or" the judge conveyed to the jury that it could find defendant guilty of either

substantive offense — which is accurate — but left open the possibility that some jurors could have found defendant conspired in or was an accomplice in the robbery but not the assault, while other jurors could have found he conspired in or was an accomplice in the assault but not the robbery. In short, these instructions did not necessarily require that the jury unanimously conclude that defendant conspired to commit or was an accomplice in the same crime. Such a verdict cannot stand.

The jury was also told that "to find the defendant guilty of committing the crimes of robbery and/or aggravated assault charges, the State must prove [among other things] that [the co-defendant] committed the crimes of robbery and/or aggravated assault." Assuming the "and/or" in this instruction was interpreted as being a disjunctive, it is entirely possible the jury could have convicted defendant of both robbery and aggravated assault even if it found [the co-defendant] committed only one of those offenses, i.e., the jury was authorized, if it interpreted "and/or" in this instance as "or," to find defendant guilty of robbery because it was satisfied the State proved that [the co-defendant] committed an aggravated assault.

[Id. at 75-77 (citations omitted).]

In denying certification of Gonzalez, the Supreme Court expressly limited the panel's holding "to the circumstances in which it was used in this case." State v. Gonzalez, 226 N.J. 209 (2016). The context of defendant's case here is starkly different to the circumstances in Gonzalez.

N.J.S.A. 2C:13-1, which criminalizes kidnapping, provides:

A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:

1) To facilitate commission of any crime or flight thereafter;

2) To inflict bodily injury on or to terrorize the victim or another;

3) To interfere with the performance of any governmental or political function; or

4) To permanently deprive a parent, guardian or other lawful custodian of custody of the victim.

[N.J.S.A. 2C:13-1(b).]

Thus, to convict a defendant under this section, the State must prove two elements: 1) the defendant unlawfully removed or unlawfully confined another; and 2) the defendant acted with any of the four delineated purposes.

At defendant's trial, the trial court used "and/or" to distinguish between the two ways in which the first element may be satisfied, unlawful removal or unlawful confinement. It again used "and/or" to distinguish between the four purposes, one of which a defendant must have to satisfy the second element. These instructions are consistent with the model jury charge for kidnapping,

24

which too uses "and/or." See Model Jury Charge (Criminal), "Kidnapping (N.J.S.A. 2C:13-1(b),(1) to (3))" (rev. Oct. 6, 2014).

We discern no error from this jury charge, and thus the failure of defendant's counsel to object to the charge cannot be viewed as deficient or prejudicial to defendant. Unlike in Gonzalez, there would be no difference between the jury finding defendant unlawfully removed and unlawfully confined versus it finding defendant only performed one of those acts. Likewise, there would be no difference between the jury finding defendant only acted with one of the four delineated purposes versus it finding defendant possessed two, three, or all four of those purposes. These elements are met whether one or all of their options are satisfied.

Defendant also suggests a specific unanimity charge was required – in other words, that all jurors must agree that the first element was satisfied by removal or by confinement, and that all jurors must agree on the purpose held by defendant in order for the second element to be satisfied. He asserts counsel was ineffective for failing to assert this position.

However, to provide effective assistance, an attorney is not obliged "to anticipate that an otherwise valid jury instruction would later be deemed improper . . . ." Funchess v. Wainwright, 772 F.2d 683, 691 (11th Cir. 1985).

25

Indeed, courts "have rejected ineffective assistance claims where a defendant 'faults his former counsel not for failing to find existing law, but for failing to predict future law' and have warned 'that clairvoyance is not a required attribute of effective representation.'" Bullock v. Carver, 297 F.3d 1036, 1052 (10th Cir. 2002) (quoting U.S. v. Gonzalez-Lerma, 71 F.3d 1537, 1542 (10th Cir. 1995)). See, e.g., Lilly v. Gilmore, 988 F.2d 783, 786 (7th Cir. 1993) ("The Sixth Amendment does not require counsel to forecast changes or advances in the law, or to press meritless arguments before a court."); Nelson v. Estelle, 642 F.2d 903, 908 (5th Cir. 1981) ("[C]ounsel is normally not expected to foresee future new developments in the law").

We are aware of no case holding that a kidnapping conviction under N.J.S.A. 2C:13-1(b) requires the unanimity urged by defendant.[6] Thus, trial and appellate counsel's failure to raise the specific unanimity issue does not constitute ineffective assistance of counsel. A specific unanimity charge would have extended existing law and revised the model charge.

---

[6] Indeed, were unanimity required, our Supreme Court in State v. Jackson, 211 N.J. 394 (2012) arguably would have been unwilling to tolerate the uncertainty as to whether the jury in that case found asportation or confinement. See Jackson, 211 N.J. at 414 (affirming conviction although the Court could not "discern whether the jury based its verdict on the victim's removal by a 'substantial distance,' or his 'substantial confinement'").

D.

Defendant also argues his trial counsel was ineffective because she failed to prepare defendant to testify. In his first PCR certification, defendant claimed, "Early in the proceedings I told [trial counsel] that I wanted to testify. However, not once did [trial counsel] prepare me for testimony." Of trial counsel, he also stated, "Often she would refuse to discuss the case with me, she failed to see me for weeks on end, failed to prepare me to testify at trial even though I told her at the very beginning I wanted to tell the jury my side . . . ."

At trial, when asked if her client wanted to testify, trial counsel stated, "Your Honor, it changes." However, defendant insisted he wanted to testify. The trial court acknowledged that trial counsel advised defendant not to testify, and the court too attempted to explain "the down side of taking the stand" to defendant, i.e. exposing himself to cross-examination and impeachment.

Still, defendant elected to testify, as the trial court put it, "against the advice of counsel." However, when informed he would be called to the stand as the next witness, defendant protested that trial counsel had not yet prepared him to testify. The following exchange between defendant and the trial court ensued:

> DEFENDANT: [My attorney] hasn't come – hasn't seen me in days. How can she go over any questions with me that I haven't been able to go -- you guys are just

trying to throw me out there. You're trying to throw me to the wolves.

THE COURT: Once again –

DEFENDANT: I need – I need [my attorney] to at least have a couple minutes. If we can do that at least in the afternoon. Give me the morning to go over some things with [trial counsel] –

THE COURT: We're going to proceed this morning because in the last four weeks I told you this was a distinct possibility.

. . . .

DEFENDANT: At least allow me to go downstairs and speak to her for a little while.

Moments before his testimony, defendant objected further: "[my attorney] and me, we didn't go over enough – we haven't gone over anything."

Defendant's testimony did not benefit his defense. His direct testimony was unconvincing, and his credibility suffered significantly from cross-examination by the State and Chica's counsel. We fail to see how additional preparation by trial counsel would have made defendant's claims any more palatable or convincing. This is especially so in light of the overwhelming evidence against defendant that included the DNA extracted from the victim as well as the surveillance footage and E-ZPass records linking defendant's car to the time and location where Maria was dumped following her assault.

28

We note that trial counsel fulfilled her duty to advise and consult with defendant by wisely recommending defendant not to testify. But even if we were to accept defendant's claim that trial counsel should have spent more time preparing his testimony, we discern no prejudice from any under preparation. No amount of preparation would have changed the result of defendant's trial.

Moreover, defendant's claim that trial counsel failed to prepare him to testify, is belied by his testimony, which shows a series of questions asked in a logical sequence so the jury could hear defendant's version of the events in question. The fact that Chica's counsel and the assistant prosecutor attacked defendant's testimony in their summations is irrelevant. At defendant's insistence, trial counsel afforded him the opportunity to contradict the victim's testimony, portray her as a willing participant in their sexual encounter, and blame Chica and Geocoman for any harm to Maria. Unfortunately for defendant, by their verdict, the jurors did not find defendant's testimony credible.

E.

Lastly, defendant urges this court to remand this matter back to the Law Division, asserting the PCR court failed to satisfy the mandate of Rule 3:22-11 that "[i]n making a final determination upon a [PCR] petition, the court shall

29

state separately its findings of fact and conclusions of law . . . . "  Although we would have preferred a more detailed statement of reasons supporting the PCR court's determination that defendant's petition failed to set forth any viable claims for PCR, we conclude the trial court's failure to comply with the rule was harmless in this case.  Our review of defendant's thirty-page amended verified PCR petition reveals no meritorious claims, because they are either barred by Rule 3:22-4(a) or Rule 3:22-5 (claims were either expressly adjudicated or could have been raised on direct appeal), or because the claims were bare assertions or conclusions, unsupported by specific facts, as required by Rule 3:22-8.

It is axiomatic that PCR relief is not a substitute for direct appeal.  R. 3:22-3.  Collectively, Rules 3:22-4(a) and 3:22-5 provide procedural bars such that "a defendant may not employ post-conviction relief to assert a new claim that could have been raised on direct appeal, . . . or to relitigate a claim already decided on the merits."  State v. Goodwin, 173 N.J. 583, 593 (2002) (first citing R. 3:22-4; and then citing R. 3:22-5).

Any arguments not expressly addressed lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION